

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 10, 2020

**BY ECF**

The Honorable Paul G. Gardephe
Southern District of New York
40 Foley Square
New York, New York 10007

     Re:    *United States v. Claudius English*, 18 Cr. 492 (PGG)

Dear Judge Gardephe:

     The Government submits this letter in connection with the sentencing of Claudius English (the "defendant") in the above-referenced matter, currently scheduled for February 12, 2020 at 4:00 p.m. The defendant was convicted after trial of ten counts: one count of conspiracy to commit sex trafficking of minor victims, in violation of Title 18, United States Code, Sections 1591(b)(2) and 1594(c) (Count One); four counts of sex trafficking of a minor, in violation of Title 18, United States Code, Sections 1591(a) and 1591(b)(2) (Counts Two, Three, Four, and Eight); three counts of attempted sex trafficking of a minor under the age of 14, in violation of Title 18, United States Code, Sections 1591(a) and 1591(b)(1) (Counts Five, Six, and Seven); one count of kidnapping of a minor, in violation of Title 18, United States Code, Sections 1201(a)(1) and 1201(g)(1) (Count Nine); and one count of brandishing a firearm in furtherance of kidnapping, in violation of Title 18, United States Code, Section 924(c)(1)(A)(ii) (Count Ten). Subsequent to the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), the Government consented to the vacatur of Count Ten.

     In the Final Presentence Report, dated November 26, 2019 ("PSR"), the Probation Office calculated an offense level of 43, a criminal history category of I, and a resulting Guidelines sentence of life imprisonment (the "Guidelines Sentence"). For the reasons set forth below, the Government respectfully submits that a below-Guidelines sentence of 360 months' imprisonment, consistent with the Probation Office's recommendation, is necessary to satisfy the goals of sentencing.

**A. Trial and Offense Conduct**

     The defendant was arrested in November 2013 by the New York City Police Department for sex trafficking offenses as well as the kidnapping of a minor. The defendant was remanded into state custody in March 2014 for a separate criminal offense. While still in state custody, in August 2016, the defendant began to proffer with the federal Government, providing information on his clients, and his minor victims. Though the defendant was not entirely forthcoming, his cooperation contributed to the successful prosecution of a client who operated a music school for

minor children, and to the identification of multiple sex trafficking victims, including minors. In consideration of the defendant's assistance, the Government offered the defendant the opportunity to enter into a cooperation agreement, to plead guilty to some Federal charges, or to plead guilty to state charges. The defendant refused all of the options.

On May 5, 2018, the Honorable Judge Debra C. Freeman, United States Magistrate Judge of the Southern District of New York, signed a sealed complaint (the "Complaint"), charging the defendant with the same ten counts he faced at trial. The Complaint was unsealed on May 15, 2018, when the defendant was brought to federal custody pursuant to a *writ of habeas corpus ad prosequendum*. The defendant was presented before the Honorable Barbara C. Moses, United States Magistrate Judge of the Southern District of New York, and consented to detention without prejudice.

On July 16, 2018, a Grand Jury sitting in the Southern District of New York returned an indictment, 18 Cr. 492 (the "Indictment"), charging the defendant with the same ten counts.

Jury trial began on June 3, 2019. On June 10, 2019, the jury returned a guilty verdict as to all counts charged in the Indictment.

As the evidence at trial showed, throughout 2013, the defendant ran a prostitution business out of his residence in the Bronx, New York. (PSR ¶ 17). For this business, the defendant chatted with underage girls on the internet, lured them to his Bronx apartment, whereupon he took photographs of them in their underwear, and advertised those photos and the underage girls' sex services on the internet. (PSR ¶ 17). And when potential clients responded, the defendant communicated with potential clients by cellphone. (PSR ¶ 17). The defendant ultimately controlled whom the girls had sex with, when, and for how much money, and he kept a significant percentage of the money they earned. (PSR ¶ 17). The evidence also showed that the defendant used sex and sometimes force or threats of force to control these minor girls. (PSR ¶ 27, Trial Tr. 200:25 (Natasha testifying that the defendant had sex with her); *id.* 273:12-276:7 (Sarah testifying about an incident when the defendant hit her with a hanger, fired a gun multiple times on the roof, and then raped Sarah); *id.* 336:20-337:6 (Tabiatha testifying that the defendant had sex with her and Sarah on the first night they stayed with him); *id.* 353:9-17 (Tabiatha testifying about the threats that the defendant made towards her when she was out late); *id.* 354:5-355:2 (Tabiatha testifying that the defendant threatened her and her companion and then later used physical force against her when she returned too late from a date); *id.* 435:2-21 (Tatyana testifying that the defendant pointed a gun at her head when she said she wanted to leave and then raped her)).

Specifically, at trial the Government introduced testimony from four of the defendant's minor victims, Natasha ("Minor Victim-3" in the Complaint), Sarah ("Minor Victim-1"), Tabiatha ("Minor Victim-2"), and Tatyana ("Minor Victim-7"). Sarah and Tabiatha testified that they first met the defendant on the internet in or about the Spring of 2013, when they were both about 17 years old. (PSR ¶¶ 27, 28). Each was having personal and family issues at the time, and the defendant offered both his apartment as a place to stay. (Trial Tr. 223:10-14; *id.* 330:23-25). When Sarah and Tabiatha went to the defendant's apartment, he had sex with them both on the first night, explaining that he wanted to "test [them] out." (Trial Tr. 336:20-21). Thereafter, the defendant convinced the both of them to work for him as prostitutes, including by exploiting the fact that he

was letting them stay in his apartment. (Trial Tr. 234:25-235:9; *id.* 337:16-338:3). To advertise Sarah and Tabiatha, they testified that the defendant took pictures of them in lingerie that the defendant picked out, in poses that that the defendant chose, which he then overlaid with a telephone number and sometimes with text such as "girl on girl" and "anal is 250." (*See* Trial Tr. 237:253:16; *id.* 339:17-348:2) Indeed, Sarah and Tabiatha identified dozens of photos of them that were extracted from the defendant's external hard drive seized from his apartment that were posted as advertisements on the internet, including photos that were found on a Backpage.com advertisement posted by the defendant. (Trial Tr. 160:3-167:10; *id.* 251:16-253:16).

Sarah and Tabiatha also testified that the defendant controlled the prostitution business—that he communicated with the clients, selected who the girls would meet with, when, and how much to charge. (Trial Tr. 254:7-10; *id.* 256:3-11; *id.* 338:4-22; *id.* 348:11-350:24). Sarah and Tabiatha also testified that they did in fact have sex for money during the time that they lived with the defendant. (Trial Tr. 257:22-259:3; 351:10-352:21).

Sarah and Tabiatha also each testified regarding instances when the defendant used and threatened to use force against them in order to maintain control. Tabiatha testified that the defendant also became angry and threatening towards her when she disobeyed him. Specifically, Tabiatha testified that once when she was gone from the apartment for too long, the defendant verbally threatened over the phone both her and the person she was with at the time. (Trial Tr. 353:9-17; 354:5-11). And when she returned the next day, the defendant pushed her against the wall and physically dragged her out of the apartment. (Trial Tr. 354:16-355:2). Tabiatha left the defendant's apartment in or about April 2013.

Sarah testified that the defendant became angry at her on one occasion because she went on a date with someone her own age, and that, in response, the defendant hit her hard with a hanger. (Trial Tr. 273:15-25). The defendant then took a gun to the roof and fired several bullets into the air, loud enough for Sarah to hear back at the apartment. Sarah was scared enough that she put a knife under her pillow. (Trial Tr. 274:5-275:14). Later in the evening, when the defendant returned to the bedroom, he found Sarah with a knife under the pillow, became angry, and then forced Sarah to perform oral sex on him. (Trial Tr. 274:15-276:7). Some time after this incident, Sarah decided to leave the defendant for good and return to her family. (Trial Tr. 276:8-20). When she did so, the defendant again became angry and threatened her and her family over the phone. (Trial Tr. 279:17-280:14). Sarah left the defendant's apartment in or about May 2013.

Text messages extracted from the defendant's phone and introduced at trial showed that in or about September and October 2013, the defendant proactively communicated with a client—the same client who had sex with both Sarah and Tabiatha—to discuss the defendant's procurement of an 11-year old girl, an 8-year old girl, and a thirteen-year old girl for sex. (PSR ¶¶ 31-35). Specifically, with regard to the 11-year old girl, the defendant indicated that he had found an 11-year old girl, whom he had recruited to have sex with the client for sex for $3,000. (PSR ¶¶ 31, 32; Trial Tr. 391:15-20 (defendant explaining that he had told the 11-year old girl that she would get paid $3,000 for sex)). The plan ultimately fell through because the client was unwilling to pay $3,000. (Trial Tr. 391:13).

With regard to the 8- and 13-year old girls, the defendant told the client that he found these girls whom he was interested in selling to the defendant for sexual contact—oral sex for the 8-year old, and penetrative sex for the 13-year old. (PSR ¶¶ 33, 34). Because the children were so young, the defendant explained that the client could not have sex with them in the defendant's apartment, so the two men developed a plan for the client to pick up the children at a Chuck E Cheese's in Manhattan and take them to the Holiday Motel in the Bronx. (Trial Tr. 393:3-395:9; 396:15-18). And beyond the meticulous plans, the defendant actually *had* the girls in his apartment for at least some time when he contacted the client to sell them for sex, (Trial Tr. 396:7-15), and he had already recruited the children's 16-year old babysitter to help him procure the children (Trial Tr. 393:16; *id.* 395:6-7; *id.* 396:22-23).

In or about late October 2013, the defendant found Natasha. Natasha testified that she met the defendant on the internet, when she was only 16 years old. (Trial Tr. 184:22-25). The defendant offered her a job as an "escort," and told her that she could make "1,500 to 2,000 a week," and continued to recruit her to his prostitution business, even after she told him that she was 16 years old. (Trial Tr. 186:20-187:3). A few days later, Natasha traveled to the Bronx to meet the defendant and a co-conspirator named "Tiffany." (Trial Tr. 191:19-193:21). At the apartment, the defendant and Tiffany took photographs of Natasha, including of her in lingerie that the defendant and Tiffany bought. (Trial Tr. 195:23-198:3). Later that night, the defendant sent the photos that he took of Natasha to the same client who had sex with Sarah and Tabiatha, and to whom the defendant had attempted to sell an 11-year old, an 8-year old, and a 13-year old. The defendant told the client that Natasha was "15," and that "[s]he might need vodka." (Trial Tr. 400:24-402:10). That night, the client came to the defendant's apartment in the Bronx and had sex with Natasha for money. (Trial Tr 199:19-200:18). After the client left, the defendant then had sex with Natasha himself. (Trial Tr. 200:24-25). Later in the evening, the defendant, Natasha, and Tiffany went out to a restaurant. (Trial Tr. 201:1-6). However, the defendant became upset at Natasha for speaking to the cab driver, and yelled at Natasha, causing her to leave without any of her possessions, which remained in the defendant's apartment. (Trial Tr. 201:7-202:17).

In or about late October 2013, the defendant also met Tatyana, 14 years old at the time, on the internet. (PSR ¶ 36). As with Natasha, the defendant recruited Tatyana to work for him as an "escort," telling her that she would get "[o]ne thousand, to 1,500 a week. Pay for sex." (Trial Tr. 409:21-6). Over the next couple of weeks, the defendant remained in contact with Tatyana. (PSR ¶ 38). He even sent photos of Tatyana that he downloaded from the internet to some of his clients, already advertising her for sex, and describing her as a "small town girl," who "[doesn't] know her way around the city." (Trial Tr. 608:18-609:11). Then in or about mid-November 2013, Tatyana traveled from her home in New Jersey to meet the defendant in New York. (PSR ¶ 39). When Tatyana arrived at the defendant's apartment, the defendant explained his prostitution business, including showing her pictures of some of the girls who worked for him as prostitutes, and telling her about another girl called "Asia," who worked for him and was coming to meet them at the apartment. (PSR ¶ 39; Trial Tr. 428:13-430:3). Later that night, when Tatyana told the defendant that she wanted to leave, the defendant became angry; he emptied Tatyana's purse and took her money and her phone charger. (PSR ¶ 40; Trial Tr. 433:1-434:2). Tatyana, feeling that she would not be able to find her way home without the defendant's help, burst into tears and went into the bedroom. (Trial Tr. 434:4-9). The defendant followed her into the bedroom and took out a gun from the closet, which he held to Tatyana's head, told her to stop crying and to lay down on

the bed.  (PSR ¶ 41; Trial Tr. 435:2-6).  The defendant then raped Tatyana.  (Trial Tr. 435:11-21).  Tatyana eventually convinced the defendant to take her to the store for water, at which point she ran away and called the police, who arrested the defendant in front of his apartment.  (PSR ¶ 43).

## B.  The Probation Office's Guidelines Calculation and Recommendation

The Probation Office calculates a total offense level of 43, after adjusting for the enhancements applicable to each minor victim and grouping the offenses.  Within criminal history category I, the defendant's Guidelines Sentence is life imprisonment.  Nonetheless, the Probation Office recommends a sentence of 360 months' incarceration, based on, among other factors, the serious nature of the offense, the defendant's lack of remorse, his high risk for recidivism, and his lack of criminal history.  (PSR at p. 31-32).

## C.  Discussion

The Government respectfully submits that upon consideration of the sentencing factors, including the seriousness of the offense, the need to promote respect for the law, ensure just punishment, protect the public, and afford adequate deterrence, and the defendant's pretrial cooperation with the Government, a sentence of 360 months' imprisonment, consistent with the Probation Office's recommendation is warranted here.

### 1.  *Seriousness of the Offense and Respect for the Law, and Just Punishment*

The severity of the defendant's conduct is obvious and undeniable.  The defendant trafficked or attempted to traffic at least seven minor girls, one as young as 8 years-old for the purpose of selling them for sex to his clients in order to line his own pocket.  And he did so knowingly.  He knew Sarah and Tabiatha were 17 at the time that he lured them to stay with him and convinced them to work for him as prostitutes.  He knew that Natasha was only 16 at the time he recruited her to work for him.  And he knew that 14-year-old Tatyana was underage at the time he met her—he asked her age on the subway, but then told her not to stay it out loud.  The defendant knew that these girls were minors and he recruited them as sex workers anyway because he knew that he had at least one client who was interested in underage girls and was willing to pay a premium price.  Indeed, the defendant sold Sarah, Tabiatha, *and* Natasha to that client for sex, and the defendant specifically looked for girls as young as 8, 11 and 13, to satisfy the same customer.  The defendant targeted vulnerable, easy to control and gullible young girls, including those who were having troubles at home like Sarah and Tabiatha, and he did so solely to line his own pockets.

Moreover, the harm to children that results from being sold to adult men for sex is well established.  This case is no exception.  As the testimony of the minor victims bore out, even six years later, the victims still carried the trauma of what happened to them.  In the case of Sarah and Tabiatha, instead of attending high school as they should have, during the time that they lived with and worked for the defendant, they were posing suggestively in lingerie, at the defendant's direction, and engaging in commercial sex acts for the defendant's benefit.  And the trauma experienced by these minor victims was not limited to having sex with strangers for money.  The defendant himself also had sex with them, knowing that they were minors, and sometimes raping them to express his anger and his control over them.  Indeed, in the case of Sarah and Tatyana, the

defendant brandished a firearm to threaten and force these minor girls to accede to his control. In short, the defendant imposed severe psychological and physical trauma on all of his minor victims.

Finally, the defendant continued to engage in this heinous business for nearly all of 2013 until his arrest on November 19, 2013. That he continued to recruit girl after girl, that he continued to use force and to rape his victims, demonstrates that none of the defendant's behavior—even the most offensive and dangerous—was an aberration. Instead, such conduct shows a complete lack of respect for—even contempt of—the law, and warrants substantial punishment.

### 2. *The Need to Protect the Public and Deter the Defendant and Other Similarly Situated Individuals*

A substantial term of imprisonment is also needed to protect the public. The defendant's conduct, as described above, was not only extremely serious and dangerous but also not aberrational. As documented in the PSR, the defendant had little verifiable employment after 2008. (PSR ¶¶ 156-160). For a significant period, the sex trafficking of minor girls and the prostitution of adult women *was* the defendant's job. And even after he was arrested for the kidnapping of Tatyana, the defendant was arrested again four months after his release for assaulting yet another woman. (PSR ¶ 124). Thus the defendant's own behavior demonstrates a tendency to recidivate.

This likelihood for recidivism is echoed by the psychosexual evaluation conducted by Empire State Forensics. Troublingly, during the interview, the defendant told the evaluator that he thought of his "employees," the minor victims in this case, as "commodities," and that he was "doing them a favor" by helping them make money. (Evaluation at 4). The defendant also reiterated his claim that he never acted aggressively or violently towards any of his sex workers, and that he only worked with those who wanted to work, despite the substantial testimony to the contrary received at trial. (Evaluation at 4). These responses seem to reflect that the defendant continues to refuse full acceptance of responsibility for his actions. Furthermore, the defendant denied being sexually attracted to adolescents, despite having admitted to having had sex with minor girls, explaining that they were just "there," and that it was the minor girls who "would often initiate sexual contact with him." (Evaluation at 9). In short, the defendant has not identified his behavior—in particular his having sex with minors—as problematic, indicating that he is not ready to change. Indeed, in view of these and other considerations, the evaluation concluded that the defendant was in the highest risk level for adult sex offenders, reflecting that he is at risk for recidivism. (Evaluation at 17). Accordingly, a substantial sentence is necessary to protect the public.

Moreover, a substantial sentence of incarceration would send a powerful message to others who are disposed to commit similar heinous offenses against minors. Such a sentence would show that such actions will not be taken lightly, and that those who victimize children—especially particularly vulnerable ones—will be prosecuted and punished to the fullest extent of the law.

### 3. *The Defendant's Pretrial Cooperation*

The Government acknowledges that the Court should consider, to some extent, that the defendant attempted to cooperate with the Government. Though the defendant was not always entirely forthcoming, and though the defendant did not enter into a cooperation agreement with the Government, the Court can and should consider the defendant's assistance in the prosecution of the music school teacher and the identification of additional victims, as well as his willingness to admit to the sex trafficking of at least some minor girls in making its sentencing decision. The Government nonetheless believes a sentence of 360 months is warranted.

## D.  Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 360 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Michael Krouse
Frank Balsamello
Ni Qian
Assistant United States Attorneys
(212) 637-2279/2325/2364