UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

UNITED STATES OF AMERICA,

      -against-                                 **18 Cr. 492 (PGG)**

CLAUDIUS ENGLISH,

                    Defendant.
_____X

**SENTENCING MEMORANDUM ON BEHALF OF**
**THE DEFENDANT CLAUDIUS ENGLISH**

                                      James E. Neuman, P.C.
                                      Attorney for Defendant
                                      100 Lafayette Street
                                      Suite 501
                                      New York, NY 10013
                                      (212) 966-5612

**Preliminary Statement**

This memorandum is submitted on behalf of Claudius English, whose sentencing is currently scheduled for March 6, 2020. Attached to this memorandum as "Exhibit A" are various certificates. Attached as "Exhibit B" is a report prepared by Dr. Alan Goldstein. On June 10, 2019, Mr. English was convicted of: conspiring to commit commercial sex trafficking, attempting to commit commercial sex trafficking and substantive acts of commercial sex trafficking (in violation of 18 U.S.C. §§ 1594(a) and (c), and1591(a)(1), (b)(1) and (b)(2)); kidnapping (in violation of 18 U.S.C. § 1201(a)(1) and (g)(1)); and brandishing a firearm during the course of the kidnapping (in violation of 18 U.S.C. § 924(c)(1)(A)). The Probation Department has concluded that the applicable Sentencing Guideline rang is life, and recommends a sentence of 360 months of imprisonment.

The Probation Department, however, did not take into account the fact that, prior to trial, Mr. English provided substantial assistance to the government. Indeed, as was recounted in prior litigation before this Court (*see e.g.,* Affidavit of Frank Balsamello, dated 5/21/19), the government was prepared to allow Mr. English to plead guilty to all charges pursuant to a cooperation agreement. Alternatively, the government was willing to allow him to plead guilty to a single count of conspiracy to engage in sex trafficking of minors, which charge carries no mandatory minimum penalty, with the intention of candidly disclosing his assistance in investigating and prosecuting another individual (who was ultimately sentenced to approximately 10 years of incarceration). In view of all these facts, and Mr. English's complete background, we urge this Court to impose the statutory minimum sentence of twenty years of imprisonment.[1]

---

[1] The statutory minimum term of twenty years applies in the event that this Court agrees to dismiss the firearms charge, but declines to dismiss the kidnapping charge. Should this Court dismiss the kidnapping charge as well, we ask this Court to impose a sentence below twenty years of imprisonment.

**Personal background**

Mr. English, now 45 years old, was born and raised in Brooklyn, New York. PSR ¶¶ 126-27. His father worked primarily as an electrician and his mother worked as a data processor. Together, they usually were able to provide the basic needs for Mr. English and his two siblings, though there were occasional financial struggles. PSR ¶ 128. But his relationships with his parents were problematic. He occasionally witnessed his parents engage in violence against each other, including an indicent when his mother cut his father's ear with a knife, His parents also physically punished him throughout his childhood. His father even beat him while he slept. *See,* Confidential Report by Empire State Forensics ("Confidential Report"), p.5. PSR ¶¶ 127-129. Understandably, Mr. English states that he "always hated" his father and never felt really close to either parent. *See,* Confidential Report, p.5.

When was was young, his parents divorced, leaving him to be raised primarily by his mother. PSR ¶¶ 127-129. Because she worked nights, he was often left unsupervised and allowed to hang out on the streets. By the time he was in the fourth grade, Mr. English was "acting out" and getting into physical fights. PSR ¶¶ 129-30, 149, Confidential Report p.9. In the fifth grade, he was placed in "special education" classes, where he would remain for a few years. PSR ¶ 149. By the time he was 16-17 years old, he was skipping school and regularly smoking marijuana and drinking alcohol, which made him feel more comfortable socially. PSR ¶¶ 145-146, Confidential Report p.6. Increasingly, he stayed out of the house. Eventually, he moved out altogether and resided with a girlfriend. *See,* Confidential Report, p.5.

Still, during this early stage of his life Mr. English also proved that he could be productive. He worked occasionally at a grocery store. And after transferring to a "credit recovery school," he

managed to graduate high school in the early 1990s. PSR ¶¶ 148-149. Most notably, in December, 1994, he enlisted in the United States army. During the following six years, Mr. English became a parachute rigger and earned various commendations, including: the Army Commendation Medal, the Army Achievement Medal, Good Conduct Award (2nd Award), National Defense Service medal, Army Service Ribbon, Parachutist Badge, and Sharpshooter Marksmanship Badge. PSR ¶ 153.

Mr. English's time in the army, however, was also marked with some strife. He lost contact with his parents completely. PSR ¶ 127. In1994, while stationed at Fort Bragg in North Carolina, He married Shusherron Jenkins, who had reportedly become pregnant with their daughter. But they separated within months and were eventually divorced. PSR ¶ 131. In 1998, he saw Ms. Jenkins and their daughter for the last time, but he continued to pay child support voluntarily for years thereafter. He continued such payments for a period even after Ms. Jenkins told him that their daughter was not actually his biological child. PSR ¶ 131.

During his years in the army, Mr. English also manifested psychiatric issues. Twice, he attempted suicide during "alcohol-induced depression": once by consuming bleach and ammonia and once by consuming rat poison. PSR ¶ 140. He was hospitalized for three days and diagnosed with "alcohol induced mood disorder, alcohol dependence, and avoidant personality disorder." PSR ¶ 140. In addition, he was diagnosed with pulmonary sarcoidois, a condition which still requires daily use of inhalers. PSR ¶ 136. Nevertheless, in December, 2000, he was honorably discharged as an E-4 specialist. PSR ¶ 153.

After his discharge, Mr. English lived in the area of Albany, NY between 2000-2006, working as a truck driver for different companies. PSR ¶¶ 113, 155-56. During the next two years, he continued working as truck driver in Atlanta, Georgia. PSR ¶ 133. After purchasing a house in Georgia, however, Mr. English lost his job, when the economic crash occurred. As a result, he was unable to pay the mortgage and the house was repossessed. Thereafter, he moved to the Bronx. For four months he was homeless as he was attempting to procure benefits through the Veterans Administration. But eventually he found various jobs, including as a driver and security guard. PSR ¶¶ 157-160. Notably, records suggest that he was continuing to suffer from certain psychological issues. In August, 2008, his primary care physician referred him for a mental health intake evaluation at the VA medical for, among other things, "low self-esteem" and alcohol abuse. Confidential Report, p.8.

In 2009, Mr. English decided to enroll in college full-time. During the next four years, he was a full-time student at Monroe College, culminating in a bachelor's degree in Information Technology. While taking those classes, he worked pursuant to a Federal Work Study at a VA Medical center. PSR ¶¶ 150, 160. Although he continued to receive referrals for counseling. PSR ¶ 141, and still had no contact with his parents, his future looked relatively promising. As his graduation date was approaching in 2012, he had interviewed for a job as a computer technician with a VA hospital and was assured he would get an offer as soon as a position opened up.

Sometime in 2012, however, Mr. English's ex-wife – with whom he had minimal contact in the preceding years – petitioned a court to order him to pay child support. Because she had previously declared to him that he was not the biological father, he asked the Court to order a paternity test. The Court declined and instead directed him to pay monthly child support. Mr.

-4-

English was very upset by this decision, which he felt was very unjust. And he coped by increasing his alcohol consumption (eventually reaching one liter of hard alcohol a day). Perhaps because of the drinking, his social relationships suffered and he became even more isolated. PSR ¶ 147, Confidential Report p.8-9. Embittered by the legal proceedings with his ex-wife, Mr. English elected to work various off-the-book jobs, rather than pursue employment with the VA.

#### The offense conduct

It was during this period of excessive drinking, social isolation, and depression that Mr. English engaged in the conduct underlying these charges. Following a sexual encounter with a woman he met online in 2012, he began arranging for women to engage in commercial sex trafficking. He also had sexual relations with a number of those women. As argued at trial, however, Mr. English's position remains that he never employed any force against any of the women or compelled them to engage in acts of prostitution.

#### The arrests, proffers, and plea discussions

On November 16, 2013, Mr. English was arrested by the New York City Police Department for the conduct which ultimately served as the basis for the federal prosecution. He was released eleven days later, but arrested again by the NYC police on March 25, 2014, and remanded into custody. PSR ¶ 124. Subsequently, he was indicted on related cases by the Bronx District Attorney's Office. In August of 2016, federal prosecutors and law enforcement personnel met with Mr. English, and attorneys from the Bronx Defenders Office, in an attempt to persuade him to provide information. Essentially, a "reverse proffer" was then conducted. As he awaited the resolution of his cases in state custody, fellow-inmates repeatedly targeted and fought with him because he was now viewed as a "sex offender." Confidential Report, p.10.

In early September, 2016 – before being formally assigned a federal defense attorney – Mr. English met with the federal prosecutors again, accompanied by his state court-appointed attorneys. At that time, Mr. English agreed to provide information and a proffer session occurred. Approximately one week later, Mr. English was transferred into federal custody, initially at the MDC.   In late October, Mr. English proffered again to the federal prosecutors, once more in the presence of his state-court lawyers.  In February, 2017, he and his state-court attorneys met with the federal prosecutors again, this time accompanied by members of the Federal Defender's Office.  The last proffer session occurred in December, 2017, attended by the state-court lawyers and members of the Federal Defenders.

Following these proffer sessions, the primary target of the government's investigation was sentenced to approximately ten years of incarceration.  Thereafter, the prosecutors and Federal Defenders engaged in multiple discussions concerning  a resolution of potential federal charges. During a meeting in February, 2018, the prosecutors advised Mr. English that his options included signing a cooperation agreement, with the usual conditions, or pleading guilty to a single sex trafficking charge . When these discussions failed to result in an agreement, federal charges were formally filed in March of 2018. At that point, Mr. English appeared before a federal judge and for the first time – approximately eighteen months after being transferred to federal custody – federal defense counsel was formally appointed to represent him.

In October, 2018, Mr. English requested and was granted new federal attorneys.  During the following months, newly-assigned counsel continued plea discussions.  Mr. English explained to counsel that, while he was comfortable admitting guilt to sex trafficking, he would deny claims of violence (including any such claims in a PSR).   In April, 2019, the government offered a plea

agreement to a single count of a conspiracy to engage in sex trafficking (a charge which carries no mandatory minimum penalties), with a guideline range of 135-168 months.    Further, it was understood that the government would acknowledge Mr. English's cooperation to the Court and, to the extent that he contested facts set forth in a PSR relating to violence, he could pursue a *Fatico* hearing.  Although Mr. English had, by this stage, already been in custody for approximately six years, and had the option of accepting a plea with a guideline range that may have effectively entailed relatively brief additional incarceration, he insisted on proceeding to trial in order to challenge the allegations of violence before a jury.

The trial and post-trial events

Subsequently, all of the state charges were dismissed and the federal trial was held in June, 2019.  On June 10, 2019, Mr. English was convicted of all counts, including: conspiring to commit commercial sex trafficking, attempting to commit commercial sex trafficking and substantive acts of commercial sex trafficking (in violation of 18 U.S.C. §§ 1594(a) and (c), and 1591(a)(1), (b)(1) and (b)(2)); kidnapping (in violation of 18 U.S.C. § 1201(a)(1) and (g)(1)); and brandishing a firearm during the course of the kidnapping (in violation of 18 U.S.C. § 924(c)(1)(A)).  During the trial, Mr. English essentially conceded that he had engaged in non-forcible commercial sex trafficking with minors.

In the ensuing months, the Probation Office determined that the combined adjusted offense level was 43 and that Mr. English's criminal history score was zero, yielding a guideline sentencing range of life.  The Probation Office recommended a sentence of 360 months of imprisonment, but apparently did not take into account the fact that Mr. English provided assistance to the government prior to trial.

-7-

Mr. English was also evaluated by two psychologists. The first psychologist, Charity Wijetunga, concluded that Mr. English was "at above average risk for sexual recidivism" because of various risk factors, such as his difficulty empathizing with others and a history "devoid of relationships beginning in childhood ****," leading him to feel "isolated, misunderstood, and at times, persecuted by others****" Confidential Report p.17. And despite Mr. English's denials, Ms. Wijetunga opined that, based upon his visual reaction time measures, he presented "with probable sexual interest in children." Confidential Report p.17.

The second report was prepared by Dr. Alan M. Goldstein. During his interview, Dr. Goldstein observed that Mr. English "expressed puzzlement" as to how he got so deeply involved in the offenses, adding that "Mr. English appears to have devoted considerable time thinking about his involvement in the offense, and reported his feelings of regret over the impact of his actions on his young victims." Exhibit B, p.6. In addition, Dr. Goldstein noted that a "Psychopathy Checklist" referred to in the prior report did not acknowledge that Mr. English's score fell below the threshold required for a "true psychopath" designation. Exhibit B, p.9. Dr. Goldstein agreed that Mr. English would be "an above average risk of reoffending" if released within the next three years, but said that his likelihood of re-offending decades from now is "low." Exhibit B, p.10. Dr. Goldstein also emphasized that Mr. English appeared to be "highly motivated for treatment" and viewed therapy in a positive light. Exhibit B, p.10.

In fact, since being detained in federal custody, Mr. English has attempted to be productive. While at the MDC, he worked as an orderly, serving food and mopping floors. This year at the MCC, he has worked months and hundreds of hours as an "inmate companion" on "suicide watch." *See,* Exhibit A. He has also taken various fitness and health classes. The founder and CEO of "Lead

by Example & Reverse the Trend" - a self-improvement program addressing violence protection and other issues – recounts in a letter that Mr. English has completed an eight week-course with that organization and states "it will be absolute pleasure to work with him as a volunteer with our team." Exhibit A. And as of the date of this memorandum, he is in the process of completing paperwork that will enable him to tutor other inmates.

## POINT I

### THE DEFENDANT SHOULD BE SENTENCED TO THE STATUTORY MINIMUM SENTENCE OF 20 YEARS OF INCARCERATION (OR A LESSER TERM IF THE KIDNAPPING COUNT IS DISMISSED)

The very first sentence of § 3553(a) declares that the court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection." § 3553 then directs the sentencing court to consider "the nature and circumstances of the offense and the history of the defendant," as well as the need for the sentence:

> "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

Among other factors that must be considered are "the kinds of sentences available," such as community service or home detention, (subsection 3), the sentencing guidelines (subsection 4), and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar crimes (subsection 6). *See generally, United States v Salinas,* 365

F.3d 582, 589 (7th Cir. 2004). In this case, we submit that due consideration of all of these factors warrants imposition of the statutory minimum sentence of 20 years of incarceration (or a lesser term in the event that this Court dismisses the kidnapping charge).

To begin with, we note that Mr. English has been in custody since March, 2014, initially on the related state charges. Because those state charges were eventually dismissed, all of that time should be credited against any sentence imposed by this Court. *See,* 18 USC § 3585(b); *United States v Parrilla,* 573 F.Supp.2d 802 (S.D.N.Y. 2008) (crediting the defendant for time spent in state custody based upon the conduct at issue in the federal indictment); *United States v Moore,* 978 F.2d 1029, 1031 (8th Cir. 1992) (crediting state incarceration); *United States v Merritt,* 782 F.Supp. 12, 13-14 (D. Mass. 1992) (state time should be credited if related to the federal offense); *United States v Murray,* 43 M.J. 507 (1995). Thus, this Court should begin with the assumption that Mr. English has already served almost precisely six years (the equivalent of sentence of 6 years and eleven months for an individual who receives the full amount of good-time credit).

With regard to the nature of the offense, we readily acknowledge that the offense conduct is extremely serious. Although Mr. English maintains that he did not commit any acts of violence against the victims – or attempt to traffic the victims specified in the attempted trafficking counts – he certainly engaged in sex trafficking with underage girls, and had sexual contact with a number of the victims. He understands that the impact on these victims is immeasurable and makes no attempt to minimize the nature of such conduct. Indeed, Mr. English has accepted responsibility for this conduct since he was first approached by federal prosecutors years before the federal charges were filed.

It is also important, however, to understand Mr. English's background and the circumstances that led to the offense conduct. As a child, he was repeatedly exposed to and victimized by violence. He witnessed his parents commit violence against each other and he himself was repeatedly beaten, even in his sleep.[2] After his parents divorced, he saw his father infrequently and his mother worked nights. Supervision was lax and he became estranged from both parents. He looked for guidance and companionship on the streets and began smoking marijuana and drinking alcohol, in part to overcome shyness. Behavioral issues led to his placement in special education classes. This combination of abuse, neglect, psychological issues, and substance abuse plainly made Mr. English vulnerable and susceptible to making poor judgments and committing crime.

Unlike so many federal defendants, however, Mr. English actually did not sustain any convictions as a young man. To the contrary, he graduated high school and, shortly thereafter, enlisted in the United States army. During the following six years, he earned numerous commendations, including: the Army Commendation medal, the Army Achievement Medal, Good Conduct Award, National Defense Service medal, Army Service Ribbon, Parachutists Badge, and Sharpshooter Marksmanship badge. He was eventually discharged honorably in December, 2000, as an E-4 specialist. Also during this period, he was married briefly and became a father. Needless to say, such performance in the army demonstrated that Mr. English had the ability and dedication necessary to succeed in a structured environment and meet his commitments, notwithstanding the various obstacles he faced as a youth.

---

[2]        Dr. Goldstein notes that Mr. English's history of physical abuse when was  a child continues to cause him distress and anxiety.  Exhibit B, p.7.

On the other hand, Mr. English also manifested psychiatric issues while in the army. Twice he attempted suicide. He was diagnosed with "alcohol-induced mood disorder, alcohol dependence, and avoidant personality disorder," along with pulmonary sarcoidois (a condition which still requires him to use an inhaler). And he divorced his wife within just months of their marriage. So even while enjoying some career advancement, he was also enduring some serious psychological and emotional problems.

After his discharge, Mr. English worked for approximately eight years as a truck driver for different companies, at first in Albany, NY and then in Atlanta, Georgia. Despite a lack of contact with his ex-wife and daughter, he continued to pay child support voluntarily for a few years. At one point he was able to purchase a house in Georgia. He lacked close relationships with any family members, but avoided legal trouble and seemed to be adjusting well to life after the army. The economic crash, however, had a devastating impact upon him. He lost his job and his house was repossessed. He moved to the Bronx and became essentially homeless for months, while desperately seeking assistance through the Veterans Administration. He eventually found work at a variety of jobs (including as a driver and security guard), but signs of mental health issues appeared. At one point, his primary care doctor referred him for a mental health evaluation for "low self-esteem" and alcohol abuse. Nevertheless, Mr. English persisted and decided to enroll in college in 2009.

During the following four years, Mr. English attended college full-time, eventually earning a Bachelor's degree in Information Technology, while also working part-time. Though he was referred for counseling again, his future looked relatively bright. As graduation neared, he expected to receive an offer for a job as a computer technician with the VA. Simply put, as of 2012, Mr. English had shown a positive work history, obtained a college degree, never been convicted of a

-12-

crime, and served honorably in the military, notwithstanding evidence of mental health problems, substance abuse and a complete lack of family support. In short, he was coping reasonably well, despite numerous obstacles.

All of his progress, though, was interrupted when he received a petition from his ex-wife to pay child support. Because she had declared some years prior that he was not the biological father of her daughter, he asked the Court to order a paternity test. The Court refused and ordered him to pay child support. This decision sent Mr. English into a tailspin. Just when he thought his hard work and struggles to overcome various obstacles were about to be rewarded with a college degree and improved job prospects, he was confronted with a decision that he felt was deeply unjust. Suddenly he was being forced to pay support to a woman for her child even though she had boldly told him he was not even the biological father. Mr. English reacted to these events in a self-destructive manner. He greatly increased his alcohol consumption. He became more isolated from his remaining friends. In order to avoid the court-ordered child support, he chose to work jobs that were "off-the-books" even though they offered fewer opportunities for advancement. Finally, later that year, he commenced engaging in commercial sex trafficking, leading to his arrest in November of 2013 and then again in March of 2014.

The foregoing history, we submit, indicates that the offense conduct can be attributed to a combination of factors, including: financial pressure, substance abuse, mental health issues, legal setbacks, and an absence of supportive friends and family. For a variety of reasons, in 2012 Mr. English became so disillusioned and distraught that he turned to crime. But whatever the cause, this conduct was out of character. Before 2012, he had never been arrested for any serious crime or accused of similar conduct.

-13-

Thus, Mr. English is far from a hardened criminal. To the contrary, his record is replete with extended periods of employment an education (as well as six years of admirable service to his country). Unlike so many federal defendants who have shown that prior sentences proved inadequate, there is no basis for inferring that an especially lengthy sentence is necessary to deter him from committing additional crimes. If anything, Mr. English's history prior to the offense conduct constitutes strong reason for leniency.

Another distinguishing feature of this case is the fact that Mr. English provided substantial assistance to the government prior to trial. Despite the rather cursory acknowledgment of Mr. English's cooperation in the government's sentencing submission, it is undisputed that the government considered his assistance sufficient enough so as to provide him the option of entering into a cooperation agreement (assuming that he would plead guilty to all charges). Alternatively, the government offered him the option of pleading guilty to a single conspiracy count, carrying no minimum sentence and guidelines in the range of 135-168 months. Considering these offers, and the fact that the target of his cooperation was sentenced to approximately 10 years of incarceration, it would be highly unusual – if not unjust – to sentence Mr. English anywhere close to the term recommended by the Probation Department and the government.

Indeed, the circumstances surrounding Mr. English's insistence on proceeding to trial are themselves revealing and significant. As was disclosed during pretrial motion practice, Mr. English was transferred to a federal jail in September, 2016. Although members of the Federal Defenders office were present at some ensuing proffer sessions, Mr. English was not brought before a federal judge (or formally assigned counsel) until March of 2018, when federal charges were finally filed. Several more months elapsed before Mr. English requested and was granted new (and current)

-14-

counsel. Once new counsel entered the case, it became clear that the extended delay in assigning Mr.

English federal representation had severely impacted his attitude. Perhaps influenced by his fellow-

inmates at the MCC – and perhaps because of underlying psychological conditions – Mr. English

had grown severely mistrustful of the government, defense attorneys, and the criminal justice system

generally.[3]

The impact of this mistrust cannot be overstated. As mentioned above, the government

eventually offered to allow Mr. English to sign a plea agreement by which he would admit guilt to

a single count of conspiracy to commit sex trafficking (which carried no statutory minimum

sentence). As such, this plea would only have required Mr. English to admit guilt to a charge which

he actually had no intention of contesting at trial. But by the time this offer was extended, Mr.

English had become so embittered by the process that he refused all offers.

To be blunt, it is the opinion of counsel that the delays Mr. English endured caused him to

make a decision that was patently irrational and self-destructive. But at the same time, we submit

that the irrationality of the decision to proceed to trial should be attributed to inadequate coping

skills, a lack of support from his family, a history of being physically abused, and underlying

psychological issues. The decision should *not* be construed as a refusal to take responsibility or any

indication that he is likely to recidivate. Indeed, as Dr. Goldstein rightly notes, even if this Court

imposes the statutory minimum sentence, Mr. English will be released when he has reached an age

where recidivism is statistically very unlikely. Whenever he is released, he will also be forced to

register as a sex offender, thereby further reducing the chance for him to repeat his crimes.

---

[3]     Both of the psychologists' reports indicate that Mr. English is overly suspicious and alienated from others. Exhibit B, pp.2-3. Confidential Report, p.17.

Notably, Mr. English has been using his time in federal custody productively. While at the MDC, he worked as an orderly, serving food and mopping floors. While at the MCC, he has worked hundreds of hours over many months on "suicide watch." He has taken various fitness and health classes. He has impressed the Founder and CEO of "Lead by Example" by his dedication to helping act as a messenger with their violence prevention program. *See,* Exhibit A. And as of the date of this memorandum, he is in the process of completing paperwork that will enable him to tutor other inmates. It also bears mentioning that Dr. Goldstein emphasizes in his report that Mr. English appears sincerely remorseful for his conduct and is "highly motivated" to receive treatment and professional help. Exhibit B, pp.6, 10.

Finally, we note that, as a convicted sex offender, Mr. English's experience during incarceration is likely to be particularly difficult. While in state custody, he was attacked repeatedly because of the nature of the accusations against him. He may well face similar reprisals in federal prisons. Such conditions should be taken into account by this Court in fashioning an appropriate sentence.

For all these reasons, we submit that this Court should impose the statutory minimum of twenty years of incarceration (or less in the event that the kidnapping count is dismissed). Any greater sentence would be unnecessary to meet all of the statutory sentencing goals.

Dated: New York, NY
      August 20, 2019

_____
/s/
_____

James E. Neuman, P.C.
Attorney for Defendant Claudius English
100 Lafayette Street
Suite 501

-16-

New York, NY 10013
(212) 966-5612