**ALAN M. GOLDSTEIN, Ph.D., PC**
NYS & CT LICENSED PSYCHOLOGIST
BOARD CERTIFIED IN FORENSIC PSYCHOLOGY
AMERICAN BOARD of PROFESSIONAL PSYCHOLOGY

20 Old Mamaroneck Road
Suite 7-H
White Plains, NY 10605

Office: (914) 693-7760
Fax: (914) 674-2563
alan.goldstein.amg@gmail.com

February 3, 2020

Mr. James Neuman, Esq.
100 Lafayette Street
Suite 502
New York, NY 10013

    Re: *USA V. Claudius B. English*
       Doc. No.: 18 CR 492-001 (PGG)

Dear Mr. Neuman:

I conducted a forensic psychological evaluation of your client, Claudius English, at the Metropolitan Correctional Center – NYC on 01/07/20. Based on the Adult Psychosexual Evaluation and Risk Assessment report (09/13/19) prepared by Charity Wijetunga, J.D., M.A. (supervised by Shoshanna Must. Ph.D.) and the Presentence Investigation Report (11/22/19) submitted by USPO Nicolo L. DiMaria, you asked me to assess your client for purposes of sentencing.

I reviewed the two documents cited above, interviewed Mr. English regarding his background and history, and administered two psychological instruments commonly used in the fields of clinical and forensic psychology. Mr. English completed the Personality Assessment Inventory (PAI), a structured, normative measure of personality functioning and coping skills. This test was independently scored and interpreted. I also administered the Wechsler Abbreviated Scale of Intelligence–II (WASI-II), a standardized measure of intellectual functioning.

This report addresses issues that may be relevant when Mr. English's sentencing is considered.

Although I have co-authored a chapter* on the Federal Sentencing Guidelines with Daniel A. Krauss, J.D., Ph.D. (a member of the federal commission that revised these guidelines), it is not my role, nor am I qualified, to make sentencing recommendations.

*(Krauss, D.A. & Goldstein, A.M. (2007). Role of forensic mental health experts in federal sentencing proceedings. In A. M. Goldstein, *Forensic Psychology: Emerging Topics and Expanding Roles*, pp.359-384. Hoboken, N.J., John Wiley & Sons.

In your presence, I explained to Mr. English that I am a Board Certified Forensic Psychologist of the American Board of Professional Psychology, whose services were

retained by you to evaluate him for sentencing purposes. I told him that any information he provided me, if relevant, would be included in my report, whether helpful or not. He understood that my role was to provide information to his attorney rather than to assist him with his case. Mr. English had no difficulties paraphrasing this information, and the evaluation was conducted with his informed consent.

**Summary of Prior Reports:**

*Adult Psychosexual Evaluation and Risk Assessment.*

A member of the staff of Empire State Forensics evaluated Mr. English over a two-day period. The report that is based on that assessment summarizes documents reviewed by the evaluator, information provided by Mr. English, and the results of a series of instruments and assessment tools that are commonly used to evaluate sexual interests and risk, risk of future violence, and the presence of psychopathy.

This document was a carefully prepared, comprehensive report, and the results of the administered tests and instruments appear to be validly interpreted. The description of Mr. English's overall mental status resembles his presentation when I evaluated him a few months later. That is, for both evaluators, he was cooperative, alert, and pleasant throughout. He was somewhat guarded when asked about his sexual history. No evidence for symptoms associated with an underlying psychosis was found in this report or during my assessment.

On scales of the MMPI-2-RF, which assess response style (malingering, exaggeration, minimization, and denial), his scores did not provide "evidence that Mr. English was dishonest in his self-report." However, on another instrument, the AASI-3, he tended to respond in a more socially desirable fashion. It was found that he tended to minimize his sexual interest in minors both on this test and during this interview.

Mr. English's self-report related to his offenses is summarized in Ms. Wijetunga's report along with a summary of legal records related to the charges that were filed against him. In addition, his background and history are summarized. The information he provided to Ms. Wijetunga is consistent with the details of his life as he reported them to me. I will summarize Mr. English's relevant history in a later section of this report.

A review of the results of the tests administered in September 2019 find that Mr. English does not identify hypersexuality as a problem for him. Similarly, he reports "a below average level of hostile sexism and an above average level of benevolent sexism." On other instruments, Mr. English tended to minimize his level of social isolation and his sense of loneliness. He reported an average level of impulsivity and "does not view sex with minors as problematic…[for him]."

On the MMPI-2-RF, Mr. English endorsed items that suggest a history of antisocial behavior throughout his lifetime. He was found to be overly suspicious and alienated

2

from prison. The relevance of these estimates of risk for a male within that age range, whether given treatment or not while incarcerated, is open to question.

*Presentence Investigation Report.*

USPO Nicolo L. DiMaria prepared a detailed Presentence Investigation Report (PSI; 11/22/19). The report indicates that, as a result of a jury trial, Mr. English was found guilty of the 10 counts with which he was charged. These include Conspiracy to Engage in Sex Trafficking of Minors, four counts of Sex Trafficking of Minors, three counts of Attempted Sex Trafficking of a Minor Victim, Kidnapping of a Minor Victim, and Use of a Firearm in Furtherance of Kidnapping. Mr. English's victims ranged in age from eight to 17.

P.O DiMaria reports that Mr. English received two disciplinary actions, both for refusing a work program assignment. No prior arrests, as either a juvenile or an adult, were reported.

It is noted that Mr. English had been abused multiple times by his father, and when injuries were noted by the family physician, a report was made to CPS. However, no follow-up of this report is noted. Mr. English was married, divorced, and he reported that he later found out that a child that he thought was his, was, according to his ex-wife, another man's. He served in the military and was diagnosed with Alcohol Induced Mood Disorder, Alcohol Dependence, and Avoidant Personality Disorder. Mr. English has a history of two suicide attempts, one by ingesting rat poison and another by drinking a combination of bleach and ammonia.

An addendum to the PSI report was submitted. The final recommendation contained in this report was 360 months of incarceration and a five-year period of supervised release.

**Evaluation of Claudius English:**

As previously noted, I evaluated Mr. English at the Metropolitan Correctional Center with his informed consent. I explained the nature and purpose of our session, as well as the lack of confidentiality of the information he provided me should I be asked by his attorney to submit a report.

*Background and history.*

The history provided me by Mr. English is consistent with the history reported by Ms. Wijetunga. According to Mr. English, he was born in Brooklyn to Edith Charles and Claudius English. His parents were married at the time of his birth, and they were divorced when Mr. English was age 15 or 16. He recalled that his parents had numerous arguments, and on one occasion, "when I was very young, she [his mother] cut him [his father] with a knife." He explained that the police were never called and no report was filed.

4

from others. He avoids interpersonal closeness. On the other scales of this instrument, despite his reported history during this interview (and his interview with me), Mr. English did not believe that alcohol and marijuana use is problematic for him. No evidence for psychosis, depression, mania, or anxiety was found.

Based on Mr. English's reaction time to a series of slides (Able Assessment for Sexual Interest-3), contrary to his self report, results are consistent with those obtained by others who are interested "in female children between the ages of 6 and 13, adolescent females, and adult females."

The Hare Psychopathy Checklist-R (PCL-R; 1980) was completed by Ms. Wijetunga based on information she possessed about Mr. English. It is noteworthy that a more recent edition, the PCL-R-2, replaced this edition of the instrument in 2003. I assume the author of the report used the more recent edition.

Ms. Wijetunga reported that the ratings she assigned to the 20 items that comprise this instrument reflect the presence of "behavioral and lifestyle psychopathic traits." On the PCL-R, Mr. English earned a total score of 20. The report states that his overall score "exceeded that for more than 50% of other adult male offenders, reflecting a moderate level of psychopathic traits." Although this information is correct, it is essential to note that Mr. English's score does *not* exceed the threshold or cutoff total score of 30 used to identify those "termed psychopaths [test manual]."

Regarding the likelihood of sexual recidivism, a number of instruments commonly used to evaluate static and dynamic risk factors were completed. In analyzing the results of the two instruments, Ms. Wijetunga concludes "… although Mr. English was identified as being at below average risk for sexual recidivism when static (i.e., historical, or unchangeable) risk factors were assessed… he was identified as possessing a higher level of treatment needs when dynamic (i.e., changeable, amenable to intervention) risk factors were assessed…." She concludes that when considering these risk estimates, he represents an "Above Average" risk category for adult sexual offenders. Mr. English's long-term use of alcohol and marijuana is reported and correctly described as a risk factor associated with both sexual and nonsexual recidivism.

Ms. Wijetunga included estimates for sexual reoffending for one, three, and five-year periods if residing in the community. Since Mr. English is facing a mandatory sentence of 27 years before he is released, these figures, although correct, are irrelevant for him.

It is recommended that following his mandatory minimum prison sentence of 27 years, Mr. English should be "reassessed prior to his release to identify his treatment needs in the community and help to determine what supervision conditions would support a successful discharge."

As noted in this report, if given the mandatory sentence of 27 years or an enhanced sentence of 30 years, Mr. English would be between the ages of 72 and 75 when released

3

According to Mr. English, his father physically abused him throughout his childhood. Specifically, he frequently beat him with his hands and with a belt. When Mr. English was in the fourth or fifth grade, Child Protective Services was contacted by a family physician. Although investigators visited his home, no actions were taken.

Mr. English recalled that his mother filed for divorce, and he was taken care of by his older sister, Camille. "She was in college at age 17." He reported that he was placed in regular classes until the fifth or sixth grade. However, "I behaved badly; my brain works differently." He was placed in special education classes but returned to regular classes in the seventh grade. Around that time, he dropped out of school "because I was young, stupid, smoking weed, and working." He wanted to enter military service, and at the advice of his military recruiter, he took summer classes one year after leaving school and earned a Non-regents Diploma in 1993. According to Mr. English, he earned a BA degree in Information Technology from Monroe College in the Bronx. He told me that he took courses both onsite and online.

Mr. English stated that he enlisted in the armed forces, but military records are not available to confirm this information. He told me that he was last stationed in Italy in December 1994. He reported that he received an Honorable Discharge with no conditions. According to Mr. English, he was never broken in rank or subjected to any disciplinary actions while in the military.

Mr. English held a number of jobs, most involving driving trucks. He left these jobs for a range of reasons: insufficient pay; bankruptcy of a company; too much time spent away from home; and having his driver's license suspended in error. When he left the military, he participated in a vocational counseling program funded by the Veterans' Administration. Eventually, he secured a position working at a VA Hospital in a work-study program.

At age 18, Mr. English began to take sips of alcohol offered to him by his father. His drinking became heavier shortly thereafter, "drinking until I got drunk, not alone… acting silly." His drinking increased over time, consuming rum and vodka because "It made me feel better." Mr. English attended alcohol counseling while in the military, "but I didn't follow through with the program." He reported that he returned to his use of alcohol and was drinking during the period when he was involved in these crimes.

At age 18, Mr. English began to smoke marijuana, but he stopped while in the military. Prior to enlisting, "It was day to day - weed, but I couldn't smoke in the military." He tended to downplay his use of marihuana when these crimes were committed, but he had no difficulty in describing his use of alcohol.

Mr. English stated that he was married and later divorced. He at first believed that he had a child from this marriage, but later learned from his ex-wife that he was not the baby's father. Although he went to Family Court to obtain a court order to stop requiring him to "support baby that was not mine," he lost the case, and he is in arrears for approximately $40,000 in prior child support.

Mr. English reported two suicide attempts, in 2003 and 2004. Both involved ingesting toxic liquids. Mr. English recalled seeing a psychiatrist at the Bronx Veterans' Administration Hospital "to be sure nothing was wrong." The psychiatrist informed him that he had "low self-esteem issues." Mr. English disagreed and did not follow through with psychotherapy.

When asked about his involvement in sex trafficking, Mr. English reported that he read sex ads on Craigslist." "Later I met a 24-year-old and she wanted to get involved. That's how it started, and then I ran it like a business. But I also had odd jobs paid under the table."

He volunteered that during his involvement in these crimes, he was aware that what he was doing was illegal, "but I just couldn't face it. Now I'm aware, not only that it was illegal, but it was so harmful to them [his victims]. I didn't understand at the time. I put them in danger, and they trusted me. I abused that trust."

*Observations of behavior.*

Throughout the interview and during testing, Mr. English had no difficulty focusing his attention. He asked relevant, rational questions and responded in a logical, orderly manner. No symptoms or signs of an underlying psychotic disorder or mood disorder were detected during the interview. Although appropriately concerned about the sentence he will receive, Mr. English did not appear to be clinically depressed.

He expressed puzzlement as to how he managed to get so deeply involved in the instant offenses. No mental health professional can offer an opinion as to the authenticity of one's claims of remorse. However, Mr. English appears to have devoted considerable time thinking about his involvement in this offense and reported his feelings of regret over the impact of his actions on his young victims.

Initially, Mr. English was somewhat suspicious, concerned about how the results of this evaluation might be used against him. However, as the interview progressed, he became somewhat more relaxed and responded in a rapid, spontaneous fashion. He appeared to be relatively open and talkative, despite facing a very long sentence.

*Results of psychological testing.*

On the Wechsler Abbreviated Scale of Intelligence-Second Edition (WAIS-II), a standardized measure of intellectual functioning, Mr. English achieved an overall or Full Scale 4 IQ of 102. This score falls within the Average range of intelligence. It would be surpassed by 45% of the general population. To a 95% degree of certainty, his actual IQ falls between 97 and 107, the average range.

This test consists of two sections. On the two tests that comprise the Verbal Comprehension Index, drawing upon vocabulary and abstract thinking skills, Mr.

6

English's score of 100 falls in the Average range. It would be surpassed by 50% of the population, and, to a 95% degree of confidence, his Verbal Comprehension Index falls between 94 and 106.

On the Perceptual Reasoning Index, consisting of two subtests that evaluate perceptual reasoning and the ability to integrate parts into a meaningful pattern, his score was 104, falling with the Average category. This score would be surpassed by 39% of the general population. To a 95% degree of certainty, Mr. English's Perceptual Reasoning Index falls between 97 and 111, the average category.

On the WASI-II, Mr. English's responses were logical, presented in a focused manner. He had no difficulty concentrating, and no signs of an underlying thought disorder were found.

Mr. English completed the Personality Assessment Inventory (PAI), which was independently scored and interpreted. He had no difficulty understanding the questions on this test, and he appears to have paid attention while completing this instrument. In general, "he attempted to present himself in a consistently favorable light, as being relatively free of common shortcomings to which most individuals will admit." As such, Mr. English tended to minimize or under-report possible difficulties. Therefore, his responses and the computer-generated report may not completely address possible underlying difficulties and shortcomings.

Mr. English acknowledged some areas of concern. These were associated with "alcohol abuse or dependence; impact of traumatic events; preoccupation with physical functioning; history of antisocial behavior; drug abuse or dependence; unusual sensory-motor problems; failures of close relationships; unsupportive family or friends; thoughts of death or suicide; physical signs of depression; stress in the environment; poor interpersonal rapport; and compulsiveness or rigidity." Many of these areas of concern are consistent with problems that he reported during his interviews (difficulties with alcohol and drugs; history of physical abuse; feelings of loneliness and detachment). On this test, he did not appear to make a conscious effort to present himself in a more negative light than his clinical picture would warrant.

On the PAR, Mr. English's responses are consistent with a person whose use of alcohol has affected many areas of his life. This pattern of responses suggests that despite efforts to reduce his use of alcohol, he has been unsuccessful. His responses to the PAI suggest concerns about his physical health and functioning. Despite responding to questions in a positive fashion, he did not report health concerns or issues during the interviews with me and with Ms. Wijetunga. His answers indicate problems with controlling anxiety. In addition, consistent with Mr. English's reported history of physical abuse as a child, the report states that traumatic events in his life continue "to distress him and produce current episodes of anxiety."

In general, his PAI responses reflect a somewhat positive self-image. Despite his current legal situation, Mr. English remains a confident person, capable of adapting to most

7

stressors in his life. In his interpersonal relationships, consistent with his history, Mr. English is likely to be seen as "domineering and over-controlling." He expects respect and admiration from others and "likely has little tolerance for those who disagree with his plans or desires." Mr. English is likely to be concerned about appearing passive or weak. The availability of others as sources of support is "somewhat lower than that of the average adult."

No evidence is contained on the PAI computer-generated reports to suggest the presence of thoughts of suicide. On this test, although Mr. English describes himself as somewhat unassertive, it is likely that he experiences difficulty in appropriately expressing his feelings of anger.

According to the report, "The respondent's interest in and motivation for treatment is typical of individuals being seen in treatment settings, and he appears more motivated for treatment than those not being seen in the therapeutic setting." Mr. English's acknowledgment of several underlying problems and his recognition that he would benefit from therapy, along with his positive attitude toward treatment, makes him a positive candidate for psychotherapeutic intervention.

Based solely on Mr. English's PAI responses, diagnostic considerations include: Alcohol Dependence; Other (or Unknown) Substance Dependence (Psychoactive Substance Abuse); and the possibility of Antisocial Personality Disorder.

**Conclusion:**

Mr. English was convicted on all counts with which he was charged. He is facing a mandatory minimum sentence of 27 years. The Presentencing Investigation Report recommended an enhanced sentence of 30 years imprisonment, relying on the federal sentencing guidelines. I was asked by Mr. English's attorney to conduct a forensic psychological evaluation of his client for purposes of sentencing.

It is neither my role nor within my professional expertise to make specific recommendations with regard to sentencing. Rather, I have focused on issues that might be relevant and considered prior to the pronouncement of sentence.

I reviewed the Presentence Investigation Report and the Adult Psychosexual Evaluation and Risk Assessment. I evaluated Mr. English and interviewed him regarding his background and the circumstances of the offenses. I also administered a standardized intelligence test to him, and he completed the Personality Assessment Inventory, which was independently scored and interpreted.

According to multiple sources of information, Mr. English was raised in a chaotic, violent household. He was exposed to frequent verbal altercations between his parents and once saw his mother cut his father with a knife. In addition, throughout his early childhood, he was consistently physically abused by his father. A physician, having seen his injuries,

8

contacted CPS. He recalled that someone from the agency had visited his home, but according to Mr. English, he is unaware of what actions, if any, were taken.

Mr. English's school career began with placements in regular classes. However, because of behavioral problems, he was placed in special education classes. He was returned to regular classes in the seventh grade, but shortly thereafter, he dropped out of school. In part, he attributes his leaving school at an early age to his abuse of alcohol and marijuana. At the advice of a military recruiter, Mr. English returned to summer session the following year to complete high school. Later, he earned his BA degree in Information Technology from Monroe College. He has a history of employment as a truck driver; he worked at a number of such jobs and left them for a range of reasons.

Mr. English reports that he enlisted in the Armed Forces and received an Honorable Discharge. He had problems with alcohol abuse while serving in the military. He was referred to a psychologist because of "a low self-image." Reports indicate two suicide attempts by ingesting bleach, ammonia, and rat poison. Mr. English never followed through on recommendations that he continue treatment. His participation in alcohol abuse programs was temporary. According to Mr. English, he had been abusing alcohol during the time of the crimes.

A review of the Psychopathy Checklist, (PCL-R), administered by Ms. Wijetunga, reports a number of psychopathic traits, consistent with Mr. English's history. However, it is *not* noted in her report, that his total score of 20 on this instrument does not approach the threshold of 30, required for a "true psychopath" designation. As such, based on the test manual of this instrument, although there are psychopathic traits, it would be inaccurate to describe Mr. English as a psychopath. On the other tests administered by Ms. Wijetunga, Mr. English's interest in young girls, adolescent females, and female adults is noted. Yet, Mr. English does not identify his interests as problematic. On scales of the MMPI-2-RF, used to assess openness of answers and a willingness to respond to items in an "honest" manner, Mr. English was not defensive in completing this inventory and did respond in a valid manner.

On the Personality Assessment Inventory that I administered, Mr. English responded in a manner that tended to under-emphasize the presence of negative behaviors and minimize negative actions that others readily acknowledge. The PAI report emphasizes diagnoses associated with alcohol abuse and, most likely, the abuse of other illegal substances. The computer-generated report emphasizes that Mr. English remains disturbed and anxious about the dramatic events experienced during his childhood. He is described as a somewhat rigid, controlling person, expecting acknowledgment and respect from others.

During his interview with me, Mr. English spoke of his remorse for his actions. While mental health professionals cannot evaluate the validity of anyone's claims of regret, according to Mr. English, he has developed an understanding of the ways in which he took advantage of the trust of his victims. He discussed the impact that his actions must have had on their lives.

On the WASI-II, a standardized measure of intelligence, Mr. English is functioning well within the Average category. He achieved a Verbal Comprehension Index of 100, a Perceptual Reasoning Index of 104, and an overall or Full Scale-4 IQ of 102. There was no evidence on this test to suggest the presence of intellectual deficits or disorganized thinking, which are symptoms associated with intellectual and cognitive deficits or an active psychosis.

As reported by Ms. Wijetunga, Mr. English is currently an above average risk of reoffending if released into the community within the next three years. His mandatory minimum sentence is 27 years and, if he receives this sentence, Mr. English will be 72 years-of-age when he is released from prison. If he were to be sentenced to three more years, he will be 75 years old. Given his age at the time of release, almost three decades from now, his likelihood of reoffending is low. It is likely that multiple years of supervised release will be required, including mandatory drug testing. As such, although the field of violent and sexual risk assessment does not, at the present time, permit experts to indicate "no likelihood of future risk," it might be probable if close reassuring that close supervision will be a requirement upon his release.

Instruments and methodology used to assess future risk will undoubtedly change dramatically over the next two decades. Tools currently in use will be obsolete. Ms. Wijetunga's recommendation that Mr. English be reassessed before release will, undoubtedly, result in more accurate, targeted assessments.

Although additional years of imprisonment may reflect the "punishment" aspect of incarceration, it is unlikely that a longer period of incarceration would impact his level of future risk.

Based on my assessment, including his responses to the PAI, I find Mr. English to be highly motivated for treatment. He views therapy in a positive light, recognizing the need for professional help. He is of average intelligence and possesses a more than adequate vocabulary with which to communicate with a therapist. As such, he is like to benefit from treatment that is offered to him.

Mr. English should be involved in treatment that focuses on multiple aspects of his behavior and personality. Given his history, there was a need for treatment focusing on both alcohol and drug abuse. Similarly, programs designed for inmates with a history of sexual abusing, specifically of minors, should prove to be of direct benefit to him. If available, programs related to anger management and the development of empathy and interpersonal skills would also be appropriate for him; such programs would improve his interactions in prison and enhance his ability to relate to others when released.

Alan M. Goldstein, Ph.D., PC
Board Certified in Forensic Psychology-
American Board of Professional Psychology.

10