UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

CLAUDIUS ENGLISH,

                              Defendant.

**MEMORANDUM
OPINION & ORDER**

18 Cr. 492 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On June 10, 2019, a jury convicted Defendant Claudius English of conspiracy to

engage in the sex trafficking of minors (Count One); four counts of sex trafficking of minors

(Counts Two, Three, Four and Eight); three counts of attempted sex trafficking of minors

younger than fourteen years old (Counts Five, Six and Seven); kidnapping (Count Nine); and

brandishing a firearm in furtherance of kidnapping, in violation of 18 U.S.C. § 924(c)(1)(A)

(Count Ten).  (Verdict (Dkt. No. 82))

English has moved, pursuant to Fed. R. Crim. P. 29, for a judgment of acquittal as

to the attempted sex trafficking, kidnapping, and firearm counts.  The Government concedes that

English's conviction on the Section 924(c) charge cannot stand, in light of United States v.

Davis, 139 S. Ct. 2319 (2019), but otherwise opposes Defendant's motion.[1]  For the reasons

---

[1]  Section 924(c)(1)(A) makes it illegal, "during and in relation to any crime of violence[,] . . .
[to] use[] or carr[y] a firearm, or . . . in furtherance of any such crime, [to] possess[] a firearm."
18 U.S.C. § 924(c)(1)(A).  Section 924(c)(3) defines a "crime of violence" as a felony that "has
as an element the use, attempted use, or threatened use of physical force against the person or
property of another" (the "elements clause"); or "that by its nature, involves a substantial risk
that physical force against the person or property of another may be used in the course of
committing the offense" (the "residual clause").  18 U.S.C. § 924(c)(3).  On June 24, 2019, two
weeks after the jury rendered its verdict in this case, the Supreme Court issued its decision in
United States v. Davis, 139 S. Ct. 2319 (2019).  In Davis, the Court held that the "residual
clause" is unconstitutionally vague.  Id. at 2336.  Accordingly, English's conviction on Count

stated below, English's motion for a judgment of acquittal will be granted as to Count Ten, but

will otherwise be denied.

## BACKGROUND

The evidence at trial established that English recruited underage girls to have sex

with adult men in exchange for money, and that English advertised the girls' "services" online

and in electronic messages to prospective clients.[2]  English arranged the "sex dates," and took

---

Ten cannot stand unless kidnapping constitutes a "crime of violence" under the "elements clause."

Although English does not argue – in his Rule 29 moving brief – that Davis requires that a judgment of acquittal be entered as to Count Ten (see Def. Br. (Dkt. No. 89) at 8-9) (arguing merely that proof of kidnapping is insufficient), the Government acknowledges that, under Davis, "kidnapping . . . is no longer a crime of violence under 18 U.S.C. § 924(c).  Accordingly, the Government concedes that the defendant's conviction as to Count Ten should be vacated." (Govt. Br. (Dkt. No. 91) at 2 n.1)  This Court agrees that a kidnapping in violation of 18 U.S.C. § 1201 no longer constitutes a categorical "crime of violence" for purposes of Section 924(c). See United States v. Walker, 934 F.3d 375, 379 (4th Cir. 2019) ("[K]idnapping clearly does not categorically qualify as a crime of violence under the force clause.").  English's conviction on Count Ten will therefore be vacated.

[2]  Many of the charges against English were not contested at trial.  In the defense opening, counsel told the jury that the charges "break down into two categories. . . . The first category is sex trafficking offenses. . . . The other set of charges, a very, very distinct set, are kidnapping and possession of a gun in furtherance of that kidnapping."  (Trial Tr. ("Tr.") 73)  As to "that first set of accusations," defense counsel represented that "there is no issue:  [English] admits that he trafficked in sex of minors in the year 2013.  That's the first set of charges in the indictment. We're not asking you to find him not guilty of those charges. . . . [W]e're telling you [he] is guilty of those . . . acts of sex trafficking."  (Tr. 74)  But "the verdict that you will render . . . in respect to the count of kidnapping and the gun possession that relates to it . . . [is] not guilty." (Tr. 75; see also Tr. 83 (defense counsel stating, in opening, that he was "not asking [the jury] to find [English] not guilty of the sex trafficking, that's admitted. . . . You are here because he said he is not guilty of [the kidnapping and firearm] counts."))

In summation, defense counsel backtracked somewhat, making a distinction between the sex trafficking counts and the attempted sex trafficking counts.  Defense counsel told the jury that it could "check off [as guilty]. . . right away" the sex trafficking conspiracy charge (Count One) and the sex trafficking counts concerning Sarah, Tabiatha, Natasha, and Tatyana (Counts Two, Three, Four, and Eight).  (Tr. 763-64)  As to the attempted sex trafficking charges set forth in Counts Five, Six, and Seven, defense counsel said the following:  "Now, what may not have

part of the money the clients paid.  The evidence showed that English contacted the girls online

through "Tagged," a social media application.  Many of the girls had a troubled family

background.  English – using the alias "Jay" – told the girls that they were attractive and that

they could make a lot of money.  (See, e.g., GX 406 (excerpts from Tagged messages))  When a

girl responded to his initial inquiry, English suggested that they communicate via text message or

over "Kik," a messaging application.  (See, e.g., GX 406 at 14 ("Can we talk on kik or text?

It[']s about business."))

English succeeded in persuading some of the girls he contacted to prostitute

themselves.  He convinced them to go on "sex dates," and promised them several hundred

dollars a "date," with English retaining a percentage of the profits.  (See, e.g., Tr. 187)

English also paid for the girls' transportation to New York City.  (Tr. 226-27)

Once at English's Bronx apartment, English took photographs of them – in lingerie or partially

nude, and in sexually suggestive poses – and used the photographs to advertise the girls for sex

on Backpage.com or Craigslist.[3]  (Tr. 236-38, 338; GX 400 (Backpage ads))  Prospective

customers contacted a telephone number English listed in the advertisements.  English arranged

all aspects of the "sex dates," including location, price, and the sex acts that the girls would

perform.  (Tr. 348-49)

English maintained regular phone contact with several repeat customers.  (See

generally GX 302 (communications with Oliver Sohngen, a/k/a "Helmuth Moss"); GX 305

---

been clear in our opening statement [is that] . . . we are challenging th[e] attempted sex
trafficking counts.  Those concern these victims who are age[s] 13, 11, and [8].  We do challenge
that."  (Tr. 764)

[3]  There was evidence at trial that Backpage.com "operated as an online forum for
advertisements, including advertisements for escort services and prostitution."  (GX 1001; Tr.
181)

(communications with "Mike Lawyer"); GX 306 (communications with "Jerry Kira"))  He

contacted these customers about new girls he hoped would interest them, including several of the

minor victims who testified at trial.  Evidence of these phone communications was introduced at

trial, and demonstrated English's successful efforts to arrange sexual transactions between these

customers and the girls English had recruited.  (See, e.g., Tr. 604-606; GX 306 at 9, 12)

## I.     TRAFFICKING OF SARAH AND TABIATHA

In the spring of 2013, Sarah and Tabiatha were seventeen-year-old high school

students living in New Jersey.[4]  (Tr. 218, 328)  Sarah lived with her mother and stepfather, but

by February 2013, she had run away from home multiple times because of an unspecified

"personal situation."  (See Tr. 221)  Tabiatha lived with her godmother, but at some point before

early March 2013, Tabiatha's godmother "put her out."  (Tr. 330)

In February 2013, a woman named Naomi contacted Sarah through Tagged.  (Tr.

221)  Sarah told Naomi that she no longer wanted to live at home; Naomi offered Sarah a place

to stay.  (Tr. 222, 302-03)  Naomi told Sarah that she went on dates and had sex with men for

money; she explained that a man named "Jay" protected her, acting as her "bodyguard."  (Tr.

221-22; 304)  "Jay" was Defendant English.  (See, e.g., Tr. 206, 219-220, 329-330, 424

(testifying victims identifying Defendant English as "Jay Barnes"))  Naomi gave English Sarah's

phone number, and he called her near the end of February 2013.  After listening to her

complaints about her family, English offered to let Sarah stay at his apartment.  (Tr. 223-224)

In March 2013, English contacted Tabiatha through Tagged.  Tabiatha told

English about the issues she was having with her family, and English offered to let Tabiatha stay

with him.  (Tr. 330)  Later in March 2013, Sarah, Tabiatha, and English all spoke together on the

---

[4]  At trial, trafficking victims were identified only by their first name.

phone; Sarah and Tabiatha learned that they attended the same high school and had mutual

friends.  (Tr. 224-25, 331)  That same month, Sarah and Tabiatha traveled together from New

Jersey to English's apartment in the Bronx.  (Tr. 226, 332)

Tabiatha testified that, once at English's apartment, English "expressed to [Sarah

and Tabiatha] that he wanted to have other people come and have sex with [them]."  (Tr. 337)

English said that he would need "to test [them] out to see how [they] would perform."  (Tr. 336)

Tabiatha "wasn't into" the idea, but "went with it" because English "threatened to put [her] out"

of his apartment if she refused.  (Tr. 337-38)  Sarah similarly testified that after she and Tabiatha

moved in to English's apartment, English pressured them to have sex for money, and that she,

Tabiatha, and English had sex their first night at his apartment.  (Tr. 233-35)  Sarah also testified

that soon after she arrived at English's apartment, he showed her a gun he kept in the apartment.

(Tr. 311-12)

English took photographs of Sarah and Tabiatha – wearing only lingerie and in

sexually suggestive poses – and posted the photos on Backpage.com and Craigslist.  (See, e.g.,

GX 325A, 326A, 326B; GX 400 at 4)  Prospective customers responded to the advertisements by

contacting telephone numbers English controlled.  English conducted all communications with

prospective customers, arranging the "sex dates," locations, and prices.[5]  (Tr. 235-36, 254, 338)

Sarah and Tabiatha each had sex with customers four or five times per week, sometimes at

English's apartment, and sometimes elsewhere.  (Tr. 257, 351)

Sarah and Tabiatha identified Oliver Sohngen as one of their customers.  (See Tr.

257-58, 351; GX 102 (photo of Sohngen))  The evidence showed that Sohngen was the

---

[5]  In his advertisements and communications with prospective customers, English referred to
Sarah and Tabiatha as "Kayla" and "Samantha," respectively.  (Tr. 245, 246, 340)

subscriber for a telephone number listed in English's phone contacts as "$$$ Helmuth Moss Any." (GX 407 (subscriber records)) As discussed below, English communicated with Sohngen via text message frequently.

After moving in with English in March 2013, both girls understood that they could not remain in his apartment unless they engaged in prostitution, but English did not otherwise threaten them in these early weeks. (See Tr. 267-68, 337-38) In April 2013, however, English became violent. Tabiatha went out to get a tattoo. She "was gone all day," and English "was mad because [she] had clients and . . . wasn't there to do [her] job." He called Tabiatha and "started making threats over the phone about how he was going to find out where [she] was[, and] . . . knew who [she] was with." He also "made threats to the person that [she] was with," calling their phone and telling them he knew their address. (Tr. 353-55) When Tabiatha returned to English's apartment the next day, "[h]e got physically aggressive with [her,] . . . pushing [her] up against the wall, t[elling her] . . . [she] wasn't shit[,] . . . [and to] get out of his house, dragging [her] towards the door[,] . . . and push[ing her] out . . . ." (Tr. 354-55; see also Tr. 268) Tabiatha left the apartment and did not see English again until trial. (Tr. 355)

Sarah witnessed this altercation; she "was scared. . . . [and] didn't . . . know what to do." (Tr. 268-69) After "watching [English] do that to Tabiatha," she was "more scared for [her] life than [she] ha[d] ever been." (Tr. 272-73) Sarah nonetheless went out on a real date with someone her age. She returned to English's apartment late. English was intoxicated, and accused her of "sleeping with these boys for free when [she] could be sleeping with these men and getting paid for it." He hit her with a clothes hanger "once with a really, really hard force[,] to the point where the hanger broke in half." (Tr. 273) He then retrieved his gun, went to the roof of the apartment building, and fired off three or four shots. (Tr. 274-75) Sarah – frightened

by the shots – "grabbed a knife [from] the kitchen, [and] put it under [her] pillow."  (Tr. 275)

When English returned, he got into bed with Sarah, and discovered the knife.  Sarah told him that

she had the knife because he was scaring her.  English said that he would "give [her] something

to be scared of," and forced her to perform oral sex on him.  (Tr. 275-76)

        Sarah left English's apartment in May 2013, and returned to her family's home.

(Tr. 276)  English contacted her a couple of weeks later and threatened to tell her family and her

boyfriend that she had been working as a prostitute.  (Tr. 278-79)  He also "started threatening

[her] parents."  (Tr. 279-80)  Sarah reported English's threats to the New York City Police

Department, and told officers that English "was making girls have sex for money."  (Tr. 282-83)

Sarah had no further communication with English after May 2013.  (Tr. 279-80)

## II.    <u>TRAFFICKING OF NATASHA</u>

        On October 29, 2013, English – operating a Tagged account with the username

"The Best NYC Agency" – sent the following message to a Tagged user operating under the

name "Smiles":  "Hi, My name is Jay.  Can we talk on Kik or text?  It's about business."  (GX

406 at 16; Tr. 184)  "Smiles" was Natasha, then a sixteen-year-old high school student who lived

in Brooklyn.  (Tr. 179)  Natasha provided English with the username for her Kik account (Tr.

185), and English began messaging her Kik account:

    [English:]  Hi

    [Natasha:]  Hi

    [English:]  Would you like a job as an escort.  Or do you know someone who would.

    [English:]  1500 -2000a week

    [Natasha:]  How old

    [English:]  How old are you

[Natasha:]  1…6

[English:]  Is your phone on

[English:]  When do you want to start?

[Natasha:]  Can't make calls ..

[Natasha:]  N what am I doing

[English:]  Getting paid for sex

(GX 301 at 1-2; Tr. 186-87)

English and Natasha continued communicating over Kik, and on November 1, 2013, Natasha provided her phone number to English.  Later that day, Natasha asked:  "Tell me something . . . The money I make is mines[?]"  English responded:  "Its 70-30.  You get 70% and [I] get % 30."  (GX 301 at 11; Tr. 187)  Shortly after 2:00 a.m. on November 2, 2013, English sent Natasha a picture of another girl who was working for him.  English told Natasha that that girl "made [$]550 tonight," and that she "want[ed] to come and get [Natasha] in the day."  (GX 301 at 13; GX 301A; Tr. 190)  That afternoon, Natasha traveled to English's apartment, where she met English and "Tiffany," who was shown in one of the photographs English had earlier sent to Natasha.  (Tr. 193)

English and Tiffany took Natasha shopping; Tiffany purchased lingerie for her. (Tr. 196)  They returned to English's apartment, where English took photographs of Natasha in the lingerie.  (Tr. 196; GX 201, 302A; 302B)  Shortly after 6:00 p.m., English and Oliver Sohngen had the following text message exchange:

[English:]  Hey.  Found a very good one. . . . 15[,] white and Spanish.  You have to come soon.

. . . .

[Sohngen:]  how much?

8

[English:]  300.  Taking the pics now.

(GX 302 at 18)

After English sent Sohngen two photographs of Natasha (see GX 302A, 302B), the two men had the following exchange:

[Sohngen:]  Okay.  Can we do 250?

[English:]  She wants 300.

[Sohngen:]  Ok.  How long is she going to be there?

[English:]  Tonight.  What time [can] you come[?]

. . . .

[Sohngen:]  Have to charge my phone.  What about 930?

[English:]  Sure

[English:]  She might need vodka.  Can [you] get a small one[?]

(GX 302 at 18-19)

Sohngen arrived at the apartment at about 10:00 p.m.  (Id. at 19)  Sohngen and Natasha had sex, for which Sohngen paid English $300.  (Tr. 199-200; see also GX 102 (photograph of Sohngen, which Natasha identified as showing "[t]he guy I had sex with"))  Later, Natasha and English had sex.  (Tr. 200)  English then took her in a cab to an IHOP restaurant.  During the cab ride, English became angry, and began yelling at Natasha.  She decided to leave.  (Tr. 201)

At about 6:00 a.m. on November 3, 2013, Natasha sent messages to English on Kik about retrieving belongings she had left at his apartment; she also asked English to "[d]elete all [her] pictures."  (GX 301 at 19; Tr. 203)  Natasha then changed her telephone number.  She did not see English again until trial.  (Tr. 203)

9

III.      **ATTEMPTED SEX TRAFFICKING COUNTS**

At trial, the Government introduced lengthy text message communications between English and Sohngen in which – according to the Government – English offered to provide Sohngen with very young girls – 8, 12, or 13 to 14 years old – for sex.  In these text messages, English and Sohngen refer to the girls by numbers:  "[t]he 41"; "the 80"; the "31" or the "21."  (GX 302 at 1, 5, 6)  The Government argued to the jury that English and Sohngen "were talking in a rudimentary code" whereby "they flipped the digits of the age because they knew that it was illegal to have sex with girls that young and they were trying to have some cover for . . . their conversation."  (Tr. 744)  Because the attempted sex trafficking counts rest almost exclusively on these text messages, these messages are discussed in detail below.

On September 7, 2013, at 1:16 a.m., English texted Sohngen:  "21 for you."[6]  An hour later, he added:  "11.  Too."  (GX 302 at 2)  At 7:13 a.m., Sohngen responded, "For real?"

---

[6]  According to the Government, English had on other occasions contacted Sohngen about having sex with minors.  On August 17, 2013, for example, English and Sohngen exchanged the following text messages:

[Sohngen:]  Hi
[English:]  It's too late.
[Sohngen:]  For who?
[English:]  The 41
[Sohngen:]  She actually exists?
[English:]  Yes.  Not the sa[m]e one.
[Sohngen:]  Never saw a pic . . .
[English:]  I know.

(GX 302 at 1)

On August 21, 2013, at 4:54 p.m., English texted Sohngen "Hi" and asked "[a]re you busy?"  (Id.)  Sohngen responded at 10:42 p.m. as follows:

[Sohngen:]  Why?
[English:]  I had something for you.  Too late.
[Sohngen:]  What?

English answered in the affirmative, but told Sohngen, "you have to come right away . . . [t]hey are two." (Id.)

At 3:06 p.m., having received no response, English wrote, "Don't have a lot of time." (Id.)

At 9:26 p.m., Sohngen responded as follows:

[Sohngen:]  Don't know when u sent this.  Phone was off.

[English:]  It's too late.  But we can make a new time.

[Sohngen:]  How much?

[English:]  Which on[e]

[Sohngen:]  Ii

[English:]  3000.

[Sohngen:]  I think we had that discussion before...

(Id.)

The exchange ended there, but Sohngen reinitiated contact the following evening:

[Sohngen:]  So.  That's pretty steep.

[English:]  Ii is a lot and its really cute.

[Sohngen:]  Haven't won the lottery to my information . . .

[Sohngen:]  Pic?

[English:]  I don't have them yet.

(Id. at 3)

---

[English:]  It's too late.  She had to go home.

(Id. at 1-2)

The "[t]he 41" and the "[s]he" in the August 21, 2013 text message are not the victims referenced in the attempted sex trafficking charges.

These text messages constitute the Government's primary evidence on Count Four, which charges the attempted sex trafficking of an 11-year-old.

On October 11, 2013, English texted Sohngen as follows:  "Hi. Good news.  31 a[n]d 08."  (Id. at 4)  Sohngen did not respond.  On October 13, English asked Sohngen to text him, noting that "[i]t[']s importan[t]."  He added: "31 and 80 and 51."  (Id. at 5)  English sent additional messages to Sohngen over the next two days (id.), but he did not respond until October 18, 2013:

[Sohngen:]  Who's this?

[English:]  Your friends on Davidson ave.

[English:]  I found a 80 and 31.

[English:]  No joke.

[Sohngen:]  Ok

[Sohngen:]  Tell

[English:]  The only this is we cant use the place on Davidson.  Any ideas

[Sohngen:]  How much?

[English:]  What good for the 80

[Sohngen:]  800

[English:]  :(

[English:]  I thought 2000 was ok.

[Sohngen:]  How about both for that.

[English:]  You cant have sex with 80.  You get Head and you can eat

[Sohngen:]  No.  Meet me in the middle

[Sohngen:]  Eat is fine.

[English:]  But you can with 31

[English:]  Do you want both.

[English:]  Both for 1600

[English:]  Do you have a place

[English:]  We cant bring the 80 to Davidson

[Sohngen:]  Not necessarily

[Sohngen:]  Can't do it there

[Sohngen:]  I understand.  No wheelchair access

[English:]  Ok.  Hotel

[Sohngen:]  Sure. But how get her in?

[English:]  Do you drive?  Im look for a place with an outside room door.  Or maybe you know one already

[Sohngen:]  I drive

[English:]  Great.

[Sohngen:]  When

[English:]  Let me get them.

[English:]  You want both?

[Sohngen:]  Ok. When

[Sohngen:]  Where

[English:]  Hold on.  Brb

[English:]  She is the other girl is getting them.

[English:]  They are in school.  After school

[English:]  Can you look up a hotel

[Sohngen:]  Can't do that late.  Would have to be now.  Need about 30 to get to bx

[Sohngen:]  I know a hotel but she needs to dress

[English:]  Dress how.

[Sohngen:]  Old

[English:]  No tits.  Lol

[English:]  She is small.

[English:]  What the name of the hotel

[Sohngen:]  I mean for getting in inconspicuously

[English:]  They going

[English:]  Whats the name of the hotel

[Sohngen:]  holiday motel

[English:]  Where is that.  I want to look it up

[Sohngen:]  2291 New England throughway

[English:]  Ok

[English:]  Thats great.  They have the outside doors.  Let them sit in the car while you get the room.

[English:]  Then park in front of the door.

[English:]  When your done.  Can you drop them off at chuck e cheese.  That where the family thinks they are going.

[Sohngen:]  Which chucks chs?

[English:]  Harlem.

(Id. at 6-8)

At trial, the Government offered evidence that the Holiday Motel is located at

2291 New England Thruway, and that the entrances to the rooms at this motel are on the outside

of the building.  (<u>See</u> GX 606, 607, 607A; Tr. 115-16)  There is also a Chuck E. Cheese restaurant in Harlem.  (<u>See</u> GX 608; Tr. 116)

After agreeing on these locations, English and Sohngen discussed other logistics:

[Sohngen:]  Where do I pick them up?

[English:]  Not sure yet.  Cant let anyone see them get into a car

[Sohngen:]  When

[English:]  After your done

[Sohngen:]  I'm driving now

[English:]  How about at the chuck e cheese

[English:]  They still in school

[Sohngen:]  Till when

[English:]  430

[English:]  They don't know they a[r]e going yet.

[Sohngen:]  Not gonna work today…

[English:]  It can if you still can

[Sohngen:]  Has to be much earlier

[English:]  What time

[Sohngen:]  I can pick them up in 30-40 min

[English:]  They are still in school.

[English:]  Hold up.  Brb.

(GX 302 at 9)

English resumed the text message exchange after about ten minutes:

[English:]  We might have to make it on saturday.

[Sohngen:]  What time?

[English:]  What time is good for you.

[Sohngen:]  Also.  Aren't ppl gonna miss them?

[English:]  That's why the 16 is tell ppl they are going to chuc[k] E cheese.

[Sohngen:]  After 5

[Sohngen:]  And how would they be there that long without supervision

[English:]  The 61 is go[i]ng to take others to chuck.  Where you are going to pick up from.  And bring back there.

[English:]  Thats covered.  They are not going in.  They are going to be out front.

[English:]  But you have to brongbthem [sic] back there.  That's importan[t].

[Sohngen:]  Ok

[Sohngen:]  Pics?

[English:]  Nope

[English:]  Its good tho

(Id. at 9-10)

The following day, October 19, 2013, English updated Sohngen as follows:

[English:]  I'm still working on i[t].

[Sohngen:]  K

[English:]  It got a[]little har[]d.  80 is hard to get out.  31 might.  Let me work on it.  Its hard work.  Just be ready.

[Sohngen:]  Ok…

[English:]  I might be able to get the 31 tonight only

[Sohngen:]  How much?

[English:]  What good for you.  I was good for you.

[Sohngen:]  So what happened to 80?

[English:]  Can't get 80 alone

[Sohngen:]  So bring them together

[English:]  That cant work.

[Sohngen:]  What happened

[Sohngen:]  ?

[English:]  Nothing.  Its always been like that.  I text when they were here but it was hard t[o] get you.

[English:]  Now the 31 is saying no.

[Sohngen:]  Hm

[English:]  Yeah.

[Sohngen:]  I was ready to come yesterday and today

[English:]  I think i might be able to get the 80 only.  Still not sure.

[English:]  Yea, but they where here last week.  Do worry.  Im going to keep trying.

[Sohngen:]  I thought they can't be on davidson

[English:]  No.  They don't live around here.

[Sohngen:]  But u said they were there …

[English:]  That was last week.

. . . .

[Sohngen:]  The 80 experienced?

[English:]  When they was here.  We could bot donit here because they can ot come out in the day.  I do not want people to see you come in the day.  Night is good.  Day time is bad.

[English:]  Or we can wait them them to have a sleep over here.  But I dint know when.

[Sohngen:]  The 80 has done it before?

[English:]  Nope

[English:]  But she will.  Its just getting her out

[Sohngen:]  So nothing tonite.  Right?

[English:]  Im not sure.  If it is.  Its going to be last minute.

(Id. at 10-12)

   After a half-hour pause, at 7:28 p.m. English reported back:

[English:]  Ok.  The 61 when to see if she can get them.  But still not sure

[Sohngen:]  K

[English:]  The plan is for you to pick them you by the post office on 149th in the bx.
Thats only if they come out.

[Sohngen:]  But it's late.  Nobody gonna miss them?

[English:]  No.  Not tonight.  Dint worry about anything.

[Sohngen:]  So when?

(Id. at 12)

   English did not respond; Sohngen followed up at 9:02 p.m.:

[Sohngen:]  ?

[English:]  Nothing yet.

[Sohngen:]  Ok.  I wait

[English:]  Not looking good.

[Sohngen:]  So calling it off?

[English:]  Just for tonight. Im going to still try

(Id. at 12-13)

   On the morning of October 21, 2013, English contacted Sohngen again:

[English:] . . . The 31 is around

. . . .

[Sohngen:]  What time?

[English:]  Im waiting for a call back

[Sohngen:]  Could meet at 1230.  Later will be hard

[Sohngen:]  Actually 1130 is possible

(Id. at 13-14)

  At 11:11 a.m., Sohngen texted, "[r]eady to come now," but English told him that

"they never called me b[a]ck."  (Id. at 14)  English suggested the following:

[English:]  Lets make a new plan.  Whats a goo[d] time for you in the morning

[Sohngen:]  Depends on the day.  But 930 is good

[English:]  Ok.  Im going to text you at 700 to let you [k]now if they are at the spot.  The new spot is 161.  Its going to be the 31 only.

[English:]  31 might be ready after school.

[Sohngen:]  7am tomorrow?  And whats[] 161?

[English:]  Yankee stadium on the 4 stop.

. . . .

[English:]  Whats a good rate for you.

[Sohngen:]  U tell me

[English:]  Im thinking 800

. . . .

[Sohngen:]  I had 31 before for much less…

[English:]  Who

[Sohngen:]  Somewhere else

[English:]  Oh

[Sohngen:]  Also need to save up for 80

[English:]  80 may never work.

[Sohngen:]  Well send me a pic of 31

[English:]  Cant

[Sohngen:]  Describe

[English:]  Short.  Spanish

[Sohngen:]  Tits?

[Sohngen:]  Small big none?

[English:]  In the middle

[Sohngen:]  Skinny?

[English:]  Not really

[Sohngen:]  Fat???

[English:]  No

[Sohngen:]  600

[English:]  700.

. . . .

[Sohngen:]  Do I have to take her somewhere?

. . . .

[English:]  Hotel

[Sohngen:]  So when?

[English:]  In the morning.

[Sohngen:]  Tomorrow for sure?

[English:]  No.  Not for sure.

[English:]  That's why i said i will txt you at 7 when the[y] are there.  They can wait there until nine.

[Sohngen:]  9 Is too early.  930

[English:]  Ok.  930.  They can wait.

[Sohngen:]  Who is they?  Also is she pretty?

[English:]  Yes she is.

[English:]  The 61 baby sitter.

(Id. at 14-17)

Several hours later, at 10:24 p.m., English gave Sohngen new instructions:

[English:]  New plans.  Wednesday at 700[a.m.]"

. . . .

[English:]  They are going t[o] be at the post office in 149th.

[English:]  (646) 503-9413.  Thats the number.  Only call it when they are read

[Sohngen:]  Ok.  Lmk at 7

(Id. at 17)

The following morning, at 7:23 a.m., Sohngen – having received no communication from English – texted him a question mark, and texted again twenty minutes later.  English acknowledged receipt at 7:54 a.m., but at 8:02 a.m. wrote: "No w[o]rking.  She keeps ch[a]nging her mind."  (Id.)  With that, communications about the 8-year-old and the 13-year-old ended.

There is no evidence, and the Government does not contend, that Sohngen ever met with 8-year-old, an 11-year-old, or a 13-year-old introduced to him by English.

**IV.**   <u>**TRAFFICKING AND ALLEGED KIDNAPPING OF TATYANA**</u>

   In the fall of 2013, Tatyana was a 14-year-old eighth-grader living with her mother and sisters in Clifton, New Jersey.  (Tr. 405)  She had created a Tagged profile with the username "Morgan Tracy," and a Kik account with the username "Morgan_ovoxo."  (Tr. 405-06, 408)

   During the evening of October 30, 2013, English – using his "Best NYC Agency" Tagged account – messaged Tatyana's Tagged account.  English wrote:  "Hi, my name is Jay.  Can we talk on kik or text?  It[']s about business."  (GX 406 at 18; Tr. 406)  Tatyana provided English with her Kik username.  (<u>Id.</u>)  Later that evening, English contacted Tatyana through her Kik account:

> [English:]  Hey.

> [English:]  Would you like a job as an escort or do you know someone who would.

> [Tatyana:]  I'd like the Job.  Tell me some information

> [English:]  1000-1500a week.  Paid for sex.

> [Tatyana:]  So I get paid at the end of the week

> [Tatyana:]  & where is this place?

> [English:]  About 1000 - 1500

> [Tatyana:]  So it's only one client or more than [one]?

> [English:]  Bronx, but you['re] mostly going to rich people in midtown.  Yes. More than one

> [Tatyana:]  So when do I start?  & these people are clean, right?

> [English:]  Yes.  You can start any time you want.

(GX 304 at 1-2; Tr. 409-10)

English asked Tatyana for her phone number, which she provided.  (GX 304 at 2; Tr. 410)  The two then arranged for Tatyana to come to New York City on November 1, 2013.  At trial, Tatyana testified that she never intended to follow through on those plans.  When English arrived at the bus station to pick her up, she told him that she was not coming.  (See, e.g., GX 303 at 2; Tr. 412-13 (English asking Tatyana whether she was on the bus and stating that he was "here"))

On the afternoon of November 15, 2013, however, Tatyana sent a text message to English stating that she was "getting on the bus soon."  (GX 303 at 3; Tr. 421)  Tatyana boarded a bus in New Jersey, bound for New York City.  (Tr. 421)  She brought with her a purse and a large Michael Kors bag containing clothing.  (Tr. 452)  Tatyana testified that she did not plan on staying overnight with English; she intended to go to her sister's home after she met English.  (Tr. 453)

While Tatyana was on the bus, English exchanged text messages with "Shantasia."  (GX 309 at 2, Tr. 138)  As discussed below, English texted repeatedly with Shantasia from this point on, while he held Tatyana at his apartment.  And it was Shantasia who English contacted in the minutes immediately after Tatyana ran away.

At about 5:10 p.m. on November 15, 2013, English sought Shantasia's assistance with Tatyana:

[English:]  Do you want t[o] help me with a new girl

[Shantasia:]  When? . . .

[English:]  Now

[Shantasia:]  I didn't even get my hair done yet

[English:]  Ok.

[English:]  It[']s the same girl that had me waiting that day

[Shantasia:]  Oh she came

[English:]  Idk.  I feel like a fool.  Im going to meet her like last time[] smh

[Shantasia:]  Oh wow oh ok hope she keeps her work

[English:]  She just said she is in NYC and I'm on the train.  Please come :(

[Shantasia:]  I can't im about to get my hair done

[English:]  Ok

[English:]  Can you after if you feel like it

[Shantasia:]  Im sorry . . .

[English:]  It[']s ok.

[English:]  Wish me luck.  Lol

(GX 309 at 9-10)[7]

English met Tatyana at the Port Authority bus terminal, and they then took the subway to the Bronx.  (Tr. 422, 424)  While on the subway, English showed Tatyana a draft text message he had typed into his phone, in which he asked Tatyana how old she was.  English told her not to say the answer out loud.  (Tr. 425-26)  After arriving in the Bronx, English bought Tatyana a meal at a Burger King, and purchased marijuana.  (Tr. 426)  They arrived at English's apartment between 7:00 and 7:30 p.m.  (Tr. 426, 459)  In a 7:29 p.m. text message to Shantasia, English advised, "I got her."  A short time later, he told Shantasia that he was "starting to dislike her already" because of "[h]er rude mouth."  (GX 309 at 10-11)

English told Tatyana that "Asia" would be coming to the apartment.  (Tr. 428)  A reasonable jury could have found that the "Asia" English referred to was the Shantasia with

---

[7]  The Court understands "smh" to mean "shaking my head."

whom he was texting.  While they waited for Shantasia to arrive, English showed Tatyana

photographs of some of his clients, as well as photographs of girls in lingerie posed on his couch.

(Tr. 429)  English then asked Tatyana to pose for photographs in lingerie, but she refused.  (Tr.

431)  The two then left the apartment at about 9:00 p.m.  (Tr. 461)  English purchased vodka at a

liquor store, and juice at a grocery store.  (Tr. 431-32)  The two then returned to English's

apartment.  (Tr. 462)  Once in the apartment, English began drinking the vodka and smoking

marijuana.  (Tr. 432, 465)

       In a 9:09 p.m. text message to English, Shantasia asks, "Hows it going[?]"  At

9:10 p.m., English responds:  "Lol.  She is not doing it.  Smh."  He added:  "We are drinking.

Smh."  English then corrected himself:  "No.  I'm drinking.  I got it[,] and she don[']t want it."

(GX 309 at 11)

       After about another hour or so, Tatyana told English, "I'm ready to go. . . . I want

to leave.  I need you to walk me back to the train."  English "got upset"; he "got mad, in a

rage[]."[8]  (Tr. 432-33, 465-66)  Tatyana was then holding her purse and the Michael Kors bag.

English took the bags out of her hands and dumped their contents on the floor.  He took

Tatyana's money, and said "Go find the train yourself."  (Tr. 433-34, 466)  Tatyana "ran off

crying into the [next] room," which turned out to be English's bedroom.  (Tr. 466)

       English followed Tatyana into the bedroom and "came [up] behind [her]."  He

retrieved a handgun from a shelf in the bedroom closet.  He "put [the gun] to [Tatyana's] head[,]

and told her to stop crying and [to] lay down."  (Tr. 434-35, 466-67)  She laid down on the bed.

English then pulled down her pants and raped her while she "was crying and . . . panicking."

---

[8]  In a 10:06 p.m. garbled text to Shantasia, English reports Tatyana's decision to leave:  "She is
going to you some."  (GX 309 at 11)

(Tr. 435)  When English was finished, he got off of Tatyana and laid down next to her on the bed.  (Id.)  He again told her to stop crying.  He picked up the handgun – which was on the bed – and told Tatyana that "if [she] stopped crying he wouldn't shoot [her]."  (Tr. 436)  He then removed the clip from the handgun.  (Id.)  When English removed the clip from the gun, Tatyana observed that it contained bullets.  (Tr. 436-37)  English then "made [Tatyana] go in the bathroom with him."  He took her phone, put it on a ledge, and told her not to touch it.  He then took a shower.  While English showered, Tatyana sat crying on the toilet.  Tatyana testified that, throughout this time, she had not felt free to leave.  She believed that if she attempted to leave the apartment, English "might shoot [her]."  (Id.)[9]

After English had showered and dressed, Tatyana told him that she was having a panic attack, that she couldn't breathe, and that she needed water.  (Tr. 437-38)  English told her that she could look in the kitchen for water.  There was no water in the kitchen.  Tatyana then asked whether they could go to a store to get water.  English reluctantly agreed.  Before they left the apartment, English "grabbed the gun," explaining that "he felt like [Tatyana] was going to run[,] so he wanted to bring the gun with him."  (Tr. 437-38)  English placed the clip back into the handgun, and put the gun in his pocket.  Tatyana retrieved her phone and charger, but left her purse and the Michael Kors bag in the apartment.  Tatyana believed that English "wouldn't let [her] leave with both of the bags."  (Tr. 439)

As English and Tatyana were walking to the store, "[English] made a right and [Tatyana] made a left and . . . ran."  (Tr. 438-39)  Tatyana began banging on cars, seeking help, but saw that English was closing in on her.  She ran in front of a laundromat and began

_____

[9]  English had a 41-second call with Shantasia at 10:58 p.m.  Two minutes later, he sent two text messages to her saying "Call me."  (GX 309 at 11)

26

screaming.  English ran away.  (Tr. 439-40)  It was then 2:32 a.m., and Tatyana called 911.  (GX 1000 (Stipulation); GX 500; Tr. 441)  She told the 911 operator that "this guy was trying to hold [her] hostage," and that she was "so scared."  Tatyana pleaded with the operator:  "Please come before he comes back.  He's going to shoot me.  Oh, my god, I have to leave from right here . . . he has a gun at his house.  Please come."  (GX 500; 500T at 1-2)

At 2:34 a.m., New York City Police Department ("NYPD") officers Gary Capellan and Johnny Chalen received the 911 dispatch transmission directing them to Tatyana's location.  (Tr. 503-05)

At 2:38 a.m., a few minutes after Tatyana had run away and called 911, English sent, deleted, and re-sent a text message to Shantasia saying "Come now."  (GX 309 at 12)

When the police officers arrived at Tatyana's location, they found her "hysterical, just crying, nervous, shaken up."  (Tr. 508)  She told the officers:  "he tried to kill me, he tried to kill me.  He didn't want to let me go.  He put a gun to my face."  (Id.)  The officers put Tatyana in their patrol car and asked her to show them where the man lived.  She directed them to English's apartment building.  The officers then observed English step outside the building.  (Tr. 509-10)  After Tatyana identified English, the officers arrested him.  (Tr. 513)  They entered English's apartment to make sure that no one was being held hostage inside.  Once inside English's apartment, the officers observed three bullets and a gun holster, but no firearm.  (Tr. 516, 518)

## DISCUSSION

### I.     LEGAL STANDARDS

Federal Rule of Criminal Procedure 29(a) provides that a court shall, upon a
defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is
insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).

"In evaluating a sufficiency challenge, [this Court] 'must view the evidence in the
light most favorable to the government, crediting every inference that could have been drawn in
the government's favor, and deferring to the jury's assessment of witness credibility and its
assessment of the weight of the evidence.'"  United States v. Coplan, 703 F.3d 46, 62 (2d Cir.
2012) (quoting United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008)); see United States v.
Mariani, 725 F.2d 862, 865 (2d Cir. 1984) ("The court should not substitute its own
determination of the credibility of witnesses, the weight of the evidence and the reasonable
inferences to be drawn for that of the jury.").  "So long as the inference is reasonable, it is the
task of the jury, not the court, to choose among competing inferences."  United States v. Kim,
435 F.3d 182, 184 (2d Cir. 2006) (internal quotation marks and citation omitted).

"The Second Circuit has observed that '[t]hese strict rules are necessary to avoid
judicial usurpation of the jury function.'"  United States v. DiPietro, No. S5 02 Cr. 1237 (SWK),
2005 WL 1863817, at *1 (S.D.N.Y. Aug. 5, 2005) (quoting Mariani, 725 F.2d at 865 (alterations
in DiPietro)).  Given this standard, "[a] defendant bears a 'very heavy burden' in challenging a
conviction based on insufficient evidence."  United States v. Goldstein, No. S2 01 Cr. 880
(WHP), 2003 WL 1961577, at *1 (S.D.N.Y. Apr. 28, 2003) (quoting United States v. Brewer, 36
F.3d 266, 268 (2d Cir. 1994)).

## II.   ATTEMPTED SEX TRAFFICKING COUNTS

English contends that he is entitled to a judgment of acquittal on the attempted sex trafficking counts (Counts Five, Six, and Seven) because there is no evidence that he took a "substantial step" towards sex trafficking the eight-year-old, eleven-year-old, and thirteen-year-old children who were the subject of his text messages with Sohngen.  According to English, "the government failed to prove that [he] took any steps beyond mere preparation or planning." (Def. Br. (Dkt. No. 89) at 11)

English further complains that – to establish the ages of the intended victims – Government relied solely on a "rudimentary code."  "[E]ven assuming . . . that the government's interpretation of the 'code' is accurate," the trial record provides an "ample basis for doubting whether [English's] representations were truthful."  (Id. at 10)

English's insufficiency arguments are not persuasive.

### A.   Attempt Liability

"'In order to establish that a defendant is guilty of an attempt to commit a crime, the government must prove that the defendant had the intent to commit the crime and engaged in conduct amounting to a substantial step towards the commission of the crime.'"  United States v. Pugh, 937 F.3d 108, 118 (2d Cir. 2019) (quoting United States v. Yousef, 327 F.3d 56, 134 (2d Cir. 2003)).  "A substantial step 'is conduct planned to culminate in the commission of the substantive crime being attempted,'" id. (quoting United States v. Farhane, 634 F.3d 127, 147 (2d Cir. 2011)), and "[a] defendant may be convicted of attempt even where significant steps necessary to carry out the substantive crime are not completed."  Yousef, 327 F.3d at 134.[10]

_____

[10]  Relying on law from other circuits, English contends that attempt liability is triggered only where "the defendant's actions have progressed so far that they would culminate in the actual commission of the crime, but for some interruption by independent circumstances."  (Def. Br.

"Determining whether particular conduct constitutes a substantial step is 'so dependent on the particular factual context of each case that . . . there can be no litmus test to guide the . . . courts.'"  United States v. Crowley, 318 F.3d 401, 408 (2d Cir. 2003) (quoting United States v. Manley, 632 F.2d 978, 988 (2d Cir. 1980)).  In determining whether conduct constitutes the requisite "substantial step," "'the finder of fact may give weight to that which has already been done as well as that which remains to be accomplished. . . .'"  Pugh, 937 F.3d at 119 (quoting Manley, 632 F.2d at 987).

"A substantial step must be something more than mere preparation," however, Crowley, 318 F.3d at 408 (internal quotation marks and citation omitted), and "[a]n act that may constitute a substantial step towards the commission of one crime may not constitute such a step with respect to a different one.  "Thus, substantial-step analysis necessarily begins with a proper understanding of the crime being attempted."  Farhane, 634 F.3d at 147.

---

(Dkt. No. 89) at 10 (citing United States v. Still, 850 F.2d 607, 609 (9th Cir. 1988); United States v. Crawford, 837 F.3d 339, 340 (8th Cir. 1988); United States v. Buffington, 815 F.2d 1292, 1302 (9th Cir. 1987); United States v. Mandujano, 499 F.2d 379, 388 (5th Cir. 1974))

This Circuit has not adopted the test posited by English.  Indeed, in discussing attempt liability under New York law – which "requires that the action taken by an accused be 'so near to its accomplishment that in all reasonable probability the crime itself would have been committed, but for timely interference,'" United States v. Pereira-Gomez, 903 F.3d 155, 166 (2d Cir. 2018) (quoting People v. Mahboubian, 74 N.Y.2d 174, 196 (1989), and citing People v. Bracey, 41 N.Y.2d 296, 300 (1977)) – the Second Circuit has observed that the standard for attempt liability under New York law "is 'more stringent that the . . . [federal] "substantial step" test.'"  Austin v. Sessions, 700 F. App'x 34, 36 (2d Cir. 2017) (summary order) (quoting People v. Acosta, 80 N.Y. 2d 665, 670 (1993)).  See also United States v. Desposito, 704 F.3d 221, 231 (2d Cir. 2013) (discussing the Second Circuit's "more liberal approach to punishing attempt crimes" compared to "the narrower common law approach that waited until the defendant was within dangerous proximity to completing the crime"); Farhane, 634 F.3d at 146 (same); cf. People v. Denson, 26 N.Y.3d 179, 189 (2015) (describing New York's requirement that the defendant "engaged in conduct that came dangerously near commission of the completed crime").  In sum, the attempt standard proposed by English constitutes "an unnecessarily restrictive view of what is required to establish a substantial step," United States v. Williams, 531 F. App'x 270, 272 n.3 (3d Cir. 2013) (summary order), and does not reflect the law of this Circuit.

At all relevant times, the applicable sex trafficking statute made it unlawful to attempt to "recruit[], entice[], harbor[], transport[], provide[], obtain[], or maintain[] by any means a person . . . knowing, or in reckless disregard of the fact, . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act."  18 U.S.C. § 1591(a) (2013).  The statute does not require the actual occurrence of a commercial sex act.

### B.   <u>Application</u>

As to the "rudimentary code" cited by English, a reasonable jury could have found that he and Sohngen reversed the numbers in recognition that plotting to sex traffic young children exposes one to serious criminal penalties.  The Government's interpretation is supported by the text messages themselves, including instances in which English mistakenly uses the real age of the child at issue (<u>compare</u> GX 302 at 4 ("Hi.  Good news.  31 a[n]d 08") <u>with</u> <u>id.</u> at 6 ("I found a 80 and 31.  No joke."); <u>compare</u> <u>id.</u> at 10 ("That's why the 16 is tell ppl they are going to chuc[k] E cheese.") <u>with</u> <u>id.</u> ("The 61 is gong to take others to chuck.")), and the elaborate precautions the two discussed.  (<u>See</u>, <u>e.g.</u>, <u>id.</u> at 8 (discussing dressing the girls to "get[] in inconspicuously" to a hotel; arranging for a hotel room with "outside doors" so the girls can "sit in the car while [Sohngen] get[s] the room," then he would "park in front of the door" to the room to get them inside); <u>id.</u> at 9 ("Cant let anyone see them get into a car"); <u>id.</u> at 10 (discussing Sohngen picking up the victims and dropping them off at Chuck E. Cheese))  Moreover, English does not squarely assert that the Government's interpretation is incorrect, much less offer an alternative explanation for the numbers English and Sohngen discussed.

English also contends that he was lying about the ages of the children.  (Def. Br. (Dkt. No. 89) at 10-11)  The jury was entitled to consider the evidence that English was

communicating with an important repeat customer, however, and the fact that the prices he set far exceeded those he usually demanded.

As to proof of a "substantial step" – given the other evidence offered at trial – the jury could have reasonably concluded that English's conduct went beyond "mere preparation or planning."

As an initial matter, the Second Circuit has made clear that "communicating a plan to others" – even without further conduct on the defendant's part – can, in certain circumstances, satisfy the substantial step element.  See Desposito, 704 F.3d at 232-33 (defendant committed "substantial step" to effect obstruction of an official proceeding where he "wrote fifteen letters . . . set[ting] out directions for [others] to falsify evidence").  While the evidence on the attempt counts consists largely of text message exchanged by English and Sohngen, that fact is not dispositive of the inquiry.  "The analysis depends on . . . whether the act [alleged to constitute a substantial step] tended to cause th[e] particular crime to occur."  Id. at 233.

Here, two minors – Sarah and Tabiatha – testified that English had arranged for them to have paid sex with Sohngen months before English and Sohngen exchanged the text messages introduced in support of the attempt counts.  The Government also introduced English's text messages to Sohngen regarding Natasha, another minor sex trafficking victim. English's text messages regarding Natasha are very similar to his text messages to Sohngen concerning the eight-year-old, the eleven-year-old, and the thirteen-year-old.  (See GX 302 at 18; Tr. 400-01 ("Hey.  Found a very good one. . . .  15[,] white and Spanish.  You have to come soon."))  English's text messages to Sohngen regarding Natasha resulted in Sohngen having paid sex with Natasha.  The jury also saw and heard evidence of other "dates" that English arranged

by text message with other customers, through which he prostituted other girls.  (See, eg., GX 302 at 18; GX 306 at 9; Tr. at 400-01, 604-605)  In short, based on the evidence introduced concerning English's other victims and his mode of conducting his business, there was substantial reason to credit the representations he made in his text messages to Sohngen regarding these young children.

English and Sohngen also discussed and negotiated in detail all key aspects of the transactions they were planning, including what sex acts Sohngen could perform and receive and at what price (GX 302 at 6 ("You cant have sex with 80.  You get Head and you can eat. . . . But you can with 31. . . . Both for 1600."); id. at 16 (agreeing on $700 price for the 13-year-old alone)); where Sohngen would pick up the girls; where he would bring them and what precautions he would take; and where he would return them.[11]

Based on the text messages, a reasonable jury could also have found that English was, at times, in the physical presence of the eight-year old, the eleven-year-old, and the thirteen-year-old, and that at these times they were under his control.  For example, on September 7, 2013, English told Sohngen that he had a "21 for you."  An hour later, he told Sohngen that he had an "11" as well.  (GX 302 at 2)  When Sohngen responded the next day, English told him he "ha[d] to come right away . . . [t]hey are two."  "Don't have a lot of time."  (Id.)  Sohngen did not respond for several hours, at which point English told him it was "too late."  (Id.)  Sohngen expressed continued interest in the eleven-year-old but complained that the $3000 price English

---

[11]  The text messages reflect four separate planned encounters:  on October 18, 2013, at the Chuck E. Cheese and the Holiday Motel; on October 19, 2013, at the U.S. Post Office located on 149th Street in the Bronx; on October 22, 2013, at the same location; and on October 21, 2013, at the 161st Street subway stop.

had set was "pretty steep."  English explained that an eleven-year-old was "a lot" and that this particular eleven-year-old was "really cute."  (Id. at 3)

On October 11, 2013, English texted Sohngen:  "Good news.  31 a[n]d 08."  (Id. at 4)  When Sohngen finally responded a week later, English told him that the "31 a[n]d 08" had been "here last week."  (Id. at 11)

A reasonable jury could have concluded that when English told Sohngen to "come right away" – because the eleven-year-old was with him – the eleven-year-old was actually with him.  Similarly, when English wrote that the "31 a[n]d 08" had been "here last week," the jury could have reasonably concluded that "here" meant at English's apartment.  And when English texted "Good news.  31 a[n]d 08," the jury could have reasonably concluded that the thirteen-year-old and the eight-year-old were with English or were within his control.  Indeed, there is evidence that English was in direct contact with the thirteen-year-old.  (See id. at 17 ("No[t] w[o]rking.  She [the 13-year-old] keeps changing her mind."))

It is unlawful to "harbor[] . . . obtain[], or maintain[]" a minor, "knowing, or in reckless disregard of the fact . . . that . . . [she] will be caused to engage in a commercial sex act." 18 USC § 1591(a) (2013).  Accordingly, in "obtain[ing]" these minors, and in causing them to come to his apartment for purposes of providing them to Sohngen for commercial sex, English took a "substantial step" towards the commission of the substantive sex trafficking offense.

Considering "the particular factual context of [this] case," Crowley, 318 F.3d at 408, including "that which [English] ha[d] already . . . done," Pugh, 937 F.3d at 119 (internal quotation marks and citation omitted), and his well-established business relationship with Songhen, a reasonable jury could have found that English's texts and conduct concerning the eight-year-old, the eleven-year-old, and the thirteen-year-old constituted "conduct planned to

culminate in the commission of the substantive crime being attempted," <u>Farhane</u>, 634 F.3d at 147

(internal quotation marks and citations omitted), and thus constituted a "substantial step towards

the commission of the crime."  <u>Pugh</u>, 937 F.3d at 118.  Accordingly, English's motion for a

judgment of acquittal on Counts Five, Six, and Seven will be denied.

## III.  <u>KIDNAPPING</u>

English contends that this Court should enter a judgment of acquittal as to the

kidnapping count because the Government did not offer sufficient evidence to demonstrate that

English (1) "restrained [Tatyana] for any appreciable period of time"; (2) "restrained [Tatyana]

for the purpose of prostitution or sex"; or (3) "used interstate commerce" to kidnap Tatyana.

(Def. Br. (Dkt. No. 89) at 3)

### A.  <u>The Federal Kidnapping Statute</u>

The federal kidnapping statute – 18 U.S.C. § 1201(a) – provides in pertinent part:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away
> and holds for ransom or reward or otherwise any person . . . when . . . the person is
> willfully transported in interstate or foreign commerce . . . , or the offender travels in
> interstate or foreign commerce or uses the mail or any means, facility, or instrumentality
> of interstate or foreign commerce in committing or in furtherance of the commission of
> the offense. . . shall be punished by imprisonment for any term of years or for life . . . .

18 U.S.C. § 1201(a).[12]

Accordingly, in order to prove English guilty of kidnapping, the Government is

required to demonstrate, by proof beyond a reasonable doubt, that (1) he "seize[d],

---

[12]  Prior to 2006, the federal kidnapping statute's jurisdictional predicate was satisfied only
where the victim was "willfully transported in interstate or foreign commerce."  In 2006,
however, Congress enacted the Adam Walsh Child Protection and Safety Act of 2006, Pub. L.
109-248, § 213, 120 Stat. 587, 616, which provides additional bases for the exercise of federal
jurisdiction over kidnappings, including "when . . . the offender travels in interstate or foreign
commerce or uses the mail or any means, facility or instrumentality of interstate or foreign
commerce in committing or in furtherance of the commission of the offense."  18 U.S.C.
§ 1201(a)(1).

confine[d], . . . abducte[d], or carrie[d] away" Tatyana; (2) he held her "for ransom or reward or

any other [purpose]," including for sex or prostitution; (3) he traveled in interstate commerce, or

that Tatyana was transported in interstate commerce, or that a "means, facility or instrumentality

of interstate or foreign commerce" was used in connection with the kidnapping; and (4) English

acted unlawfully, willfully, and knowingly.  (18 U.S.C. § 1201(a)(1); see also Tr. 844-46 (Jury

Charge))

> **B.    Application**

> **1.    Whether Tatyana was Restrained
> for an "Appreciable Period of Time"**

Although the federal kidnapping statute does not contain any temporal language,

the Supreme Court has instructed that "[t]he act of holding a kidnapped person for a proscribed

purpose necessarily implies an unlawful physical or mental restraint for an appreciable period

against the person's will and with a willful intent so to confine the victim."  Chatwin v. United

States, 326 U.S. 455, 460 (1946).  Viewing the evidence in the light most favorable to the

Government, it is clear that English held Tatyana for an "appreciable period of time."

Tatyana testified that she first arrived at English's apartment between 7:00 and

7:30 p.m.  (Tr. 426, 459)  As discussed above, several hours later, she told English that she

wanted to leave.  English became enraged, frightening Tatyana, who ran into an adjoining room,

which turned out to be English's bedroom.  (Tr. 432-33, 465-66)  English followed her into his

bedroom, grabbed a loaded handgun that was stored in the closet, "put the gun to [Tatyana's]

head[,] and told her to stop crying and [t]o lay down."  (Tr. 434-35, 466-67)  English then raped

Tatyana.  (Tr. 467)  After the assault, he told the sobbing Tatyana "that if [she] stopped crying he

wouldn't shoot [her]."  (Tr. 436; 469)  At English's direction, Tatyana then sat in English's

bathroom while he showered.  Tatyana believed that English "might shoot [her]" if she attempted

to leave.  (Tr. 437)  After English had showered and dressed, Tatyana convinced English to take

her to a store for water.  English reloaded his handgun and put the gun in his pocket.  He told

Tatyana that he was taking the gun "because . . . he felt like [Tatyana] was going to run."  (Tr.

438-39)  Once outside Tatyana fled, screaming for help.  English pursued her, but became

alarmed by her "screaming" and ran away.  (Tr. 439-40)  Tatyana called 911.  (Id.)  The NYPD

received her 911 call at 2:32 a.m.  (GX 1000 (Stipulation); Tr. 440-41)

       Based on this record, there was overwhelming evidence that Tatyana was

restrained from the moment English put a gun to her head.[13]  While English contends that there is

a "real possibility that the restraint lasted mere minutes" (Def. Br. (Dkt. No. 89) at 8), viewing

the evidence in the light most favorable to the government, the record indicates that English's

restraint of Tatyana lasted more than four hours – from shortly after 10:00 p.m. to approximately

2:32 a.m.  This evidence is sufficient to establish that Tatyana was restrained for an "appreciable

period of time."  See United States v. Blackmon, 209 F. App'x 321, 324-25 (4th Cir. 2006) ("We

find [the victim's] testimony that she was held . . . against her will for three to four hours

satisfies the requirement that the victim be held for an appreciable period of time."); United

States v. Crosby, 713 F.2d 1066, 1069, 1071 (5th Cir. 1983) (kidnapping conviction affirmed

---

[13]  English maintains that he "never told [Tatyana] she could not leave" (Def. Br. (Dkt. No. 89) at
8), but such an explicit assertion is not necessary to demonstrate restraint.  See United States v.
Betancourt, No. 3:16-CR-238 (SRU), 2019 WL 2720738, at *4 (D. Conn. June 28, 2019)
("'Holding' incorporates situations in which the victim is 'deprived of . . . her liberty, compelled
to remain where . . . she did not wish to remain. . . .'"  (quoting Chatwin, 326 U.S. at 460)).  The
evidence establishes that Tatyana felt "compelled to remain where . . . she did not wish to
remain" after English put a gun to her head.  (See Tr. 437 (Tatyana testifying that she did not feel
free to leave because, if she did, "[English] might shoot [her]"); see also Tr. 436; 469 (Tatyana
testifying that English threatened to shoot her if she did not stop crying); Tr. 438 (Tatyana
testifying that English told her, as they were leaving the apartment, that he was bringing a gun
"because . . . he felt like [she] was going to run"); Tr. 469 (Tatyana testifying that English "told
[her] he would shoot [her], and [she] believed him"))

where defendant held victim for "two to three hours . . . in [a] room with [a] shotgun");

Betancourt, No. 3:16-CR-238 (SRU), 2019 WL 2720738, at *4, 10 (proof of forced lengthy car

journey provided "ample" evidence of holding element of kidnapping).[14]

English also contends that "any [re]straint that arguably occurred during the rape

. . . was plainly incidental to the rape itself, and not a valid basis to find a kidnapping."  (Def. Br.

(Dkt. No. 89) at 8)  This argument is likewise not persuasive.

Some courts have found that no kidnapping occurs where the period of restraint is

short and merely incidental to or inherent in another offense the defendant has committed.  See,

---

[14]  United States v. Rodriguez, 587 F.3d 573, 581 (2d Cir. 2009) – cited by English (Def. Br. at 5) – is not to the contrary.

Rodriguez addresses the Hostage Act, 18 U.S.C. § 1203.  That statute prohibits "seiz[ing] or detain[ing] and threaten[ing] to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained . . . ."  18 U.S.C. § 1203. Courts interpreting the Hostage Act have "required that a defendant confine a victim for an appreciable period of time."  Rodriguez, 587 F.3d at 580 (internal quotation marks and citation omitted).

In Rodriguez, the victim – a Mexican citizen who had entered the United States unlawfully – sought to meet her husband at an airport.  The defendants induced her to enter their taxi by warning her that she would be arrested if she waited too long in the airport terminal.  Once the husband arrived, defendants demanded that he pay a $475 taxi fare, and refused to permit the victim to exit the vehicle until the husband paid.  The husband refused to pay, and police were called to the scene.  The victim was "restrained" in the taxi for fifteen minutes.  Id. at 575-77.

The Second Circuit held that "the fifteen minutes that [the victim] was confined in the taxi at the service area, without any injury or threat of injury, is not sufficient to establish a Hostage Act violation, especially in view of the fact that during most of that interval the [d]efendants, [the victim], and her husband were waiting for the arrival of the police whom they all knew had been called."  Id. at 581.  The court remarked, however, that had the confinement continued over an "approximately three-hour journey," such confinement "would qualify as [being held for] an appreciable period of time."  Id. at 580.

The facts here are not comparable to those in Rodriguez.  Tatyana was held for more than four hours; was threatened with a loaded handgun; and was raped.

e.g., United States v. Howard, 918 F.2d 1529, 1537 (11th Cir. 1990) ("The record is simply

devoid of evidence to support an inference that appellants would have detained [the victim] in

this case after stealing his money, and the limited detention inherent in the crime of robbery does

not rise to the level of a kidnapping in this case."); see also United States v. Corralez, 61 M.J.

737, 747-48 (A.F. Ct. Crim. App. 2005) (interpreting the military analogue to the federal

kidnapping statute and finding no kidnapping where defendant (1) "[w]hile sitting in [a] parked

vehicle, . . . struck [his girlfriend] in the face, pulled her hair, hit her on the leg, bit her hand, . . .

choked her" and "prevented her from [exiting the vehicle] for about five minutes by holding her

seatbelt in the locked position"; and (2) on another occasion, "pushed [his girlfriend] from room

to room and prevented her from leaving [their] apartment for about five minutes" during a fight;

"the brief holdings of [the victim] in the couple's automobile and in their apartment were

'merely incidental' to the five charged assault specifications stemming from these disputes . . .").

   Here, however, English restrained Tatyana over a period of more than four hours,

and continued to restrain her long after the sexual assault had been committed.  Accordingly, his

restraint of Tatyana was not merely "inherent" or "incidental" to the rape.

   **2.**  **Whether English Held Tatyana for Purposes**
       **of Sexual Gratification or Prostitution**

   English argues that "there was no proof that the restraint was for any particular

purpose, as [Section 1201] requires," because "the government offered no evidence that any

customers were expected to arrive that night" or that English "intended to engage in any kind of

sexual contact with the victim following the rape, which preceded the alleged restraint."  (Def.

Br. (Dkt. No. 89) at 8-9)

   This argument is nonsense.  As an initial matter, the rape did not "precede[]" the

alleged restraint"; the rape occurred immediately after the restraint began, when English held a

gun to Tatyana's head and thereby threatened to kill her.  There was thus ample evidence that English restrained Tatyana in part for the purpose of sexual gratification.

There was also ample evidence that English had induced Tatyana to come to his apartment to work for him as a prostitute.  English operated a sex-trafficking business, and he brought Tatyana to his apartment, and held her at his apartment, both for his own sexual gratification and for purposes of his prostitution business.  The fact that English did not immediately arrange a "date" with a client is irrelevant.  English clearly intended to hold Tatyana for purposes of prostitution.  The two discussed her role in his prostitution business, and as soon as she arrived at his apartment, English sought to take photographs of Tatyana in lingerie – the sort of photographs he posted on the internet as advertisements for sexual services.  (Tr. 429-31) And when she told English that she wanted to leave, he made clear – through his actions – that she was not free to go.

In sum, the evidence is sufficient to demonstrate that English held Tatyana for purposes of sexual gratification and his prostitution business.

### 3.  Whether the Government Offered Sufficient Evidence of an Interstate Nexus

As discussed above, kidnapping is a federal offense where "the [victim] is willfully transported in interstate or foreign commerce . . . , or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense."  18 U.S.C. § 1201(a).  English argues that the evidence is insufficient as to this element.

In opposing English's motion for a judgment of acquittal on the kidnapping count, the Government does not contend that either Tatyana's travel from New Jersey to New York City, or her text and online communications with English prior to and during her travel to New

York City, establish the requisite interstate nexus.[15]  The Government relies, instead, on

English's communications with Shantasia.

According to the Government, "evidence introduced at trial showed that the

defendant sent text messages to his co-conspirator, Shantasia (or 'Asia'), asking for her [to] help

the defendant with [Tatyana] before and during his confinement of [Tatyana]."  (Govt. Br. (Dkt.

No. 91) at 18)  The Government contends that "a juror could reasonably draw the inference" that

Shantasia "was a co-conspirator of the defendant's . . . whom the defendant called to help him

control [Tatyana], in furtherance of the kidnapping and sex trafficking activity."  (Id. at 19)

As an initial matter, this Court acknowledges that "an intrastate phone call may

satisfy the jurisdictional element of the kidnapping statute."  United States v. Pizarro, No. 17-

---

[15]  Any such argument would fail.  Where transportation of a victim across state lines provides the jurisdictional nexus for a kidnapping charge, "the transportation of a victim begins when he or she is 'wilfully moved from the place of her abduction.'"  United States v. Singh, 483 F.3d 489, 494 (7th Cir. 2007) (quoting United States v. Horton, 321 F.3d 476, 481 (4th Cir. 2003)).  Tatyana's "abduction" did not begin while she was in New Jersey; she travelled to New York freely and voluntarily.  Her "abduction" did not begin until she arrived in New York, met with English at his apartment and heard more about his prostitution operation, and then expressed her desire to leave.  It was at this point that English became enraged, held a gun to Tatyana's head, and made clear that she was not free to leave.  (Tr. 69, 436-38, 469)  Accordingly, Tatyana's interstate travel does not satisfy the interstate commerce requirement.  See Sand et al., Modern Federal Jury Instructions 42-2 (Commentary) (quoting Eighth Circuit Model Criminal Jury Instruction 6.18.1201 (requiring the Government to prove that the defendant "voluntarily and intentionally transported ( . . . name of person described in indictment) while [he] [she] was [seized][confined][kept][detained]; and . . . the transportation was in [interstate][foreign] commerce." (brackets in original))); id. (quoting Eleventh Circuit Pattern Criminal Jury Instructions, Annotations and Comment to Offense Instruction 49 (requiring the Government to prove, as to the interstate commerce element, that "the victim was willfully transported in interstate commerce while being kidnapped [seized] [confined] [inveigled] [decoyed] [abducted] [carried away]" (brackets in original))).

For the same reason, English's interstate communications in recruiting Tatyana do not satisfy the interstate commerce requirement, because these communications did not occur "in committing or in furtherance of the commission of the offense."  There is no evidence that – at the time English recruited Tatyana – he intended to kidnap her.

CR-151 (AJN), 2019 WL 3406603, at *6 (S.D.N.Y. July 29, 2019); see also United States v. Ramos, 622 F. App'x 29, 30 (2d Cir. 2015) (same); United States v. Crumble, No. 18-CR-32 (ARR), 2018 WL 3112041, at *2 (E.D.N.Y. June 25, 2018) ("[T]he defendants' use of cell phones in committing this crime was sufficient to provide a 'jurisdictional nexus' to prosecute them for kidnapping."); United States v. Al-Din, 631 F. App'x 313, 330 (6th Cir. 2015) ("It is well-established that 'cellular telephones, even in the absence of evidence that they were used to make interstate calls, have been held to be instrumentalities of interstate commerce.'  It is undisputed defendants used their cellular phones to arrange the kidnapping and in its immediate aftermath.  Accordingly, the government proved a federal kidnapping." (quoting United States v. Weathers, 169 F.3d 336, 341 (6th Cir. 1999))).  For use of a phone to satisfy the jurisdictional element, however, the phone must be used "in committing or in furtherance of the commission of the offense."  18 U.S.C. § 1201(a).

It is a fair inference from the evidence discussed above that Shantasia had assisted English in the past with his sex trafficking operation.  He solicited her assistance with Tatyana before the victim had even arrived in New York City, asking her in a 4:30 p.m. text message whether she "want[ed] t[o] help . . . with a new girl."  English explained that the "new girl" was "the same girl that had me waiting that day."  (GX 309 at 9)  Shantasia did not ask what "help" English needed or required with the "new girl."  It is a fair inference that Shantasia understood that English had lured the "new girl" to New York City to join his prostitution operation, and that he wanted Shantasia's help in grooming the "new girl" for that purpose.  Shantasia told English that she could not assist him that day, because she was "about to get [her] hair done" for an upcoming party.  (Id. at 9-10)  English asked whether she would come after her hair was done.  Shantasia demurred.  (Id. at 10)

Although Shantasia had told English that she could not assist him that day, he continued to report to her about developments with the "new girl," and she made inquiries as to how it was "going." English appears to have held out hope that Shantasia would come to his apartment to help with the "new girl," despite her statement that afternoon that she could not come.

English and Tatyana arrived at his apartment between 7:00 and 7:30 p.m. English told Tatyana that "Asia" would be joining them. In a 7:29 p.m. text message, English reported to Shantasia, "I got her." A short time later, English reported problems with the "new girl," including her "rude mouth." (Id. at 10-11)

In a 9:09 p.m. text message, Shantasia asks, "Hows it going." English responds that Tatyana "is not doing it." (Id. at 11) Shantasia does not ask what Tatyana has refused to do. It is a fair inference that she understands that Tatyana has refused to participate in English's prostitution business. He also informs Shantasia that he has started drinking but Tatyana has refused. (Id.) At 10:06 p.m., English sends a garbled text message to Shantasia, reporting that Tatyana has said that is she going to leave. (Id.) A reasonable jury could find that these communications were in furtherance of English's sex trafficking operation, but these communications were not made in furtherance of a kidnapping, because English had not yet restrained Tatyana.

According to Tatyana's testimony, it was immediately after she told English that she wanted to leave – in other words, at about 10:06 p.m. – that he flew into a rage. He dumped the contents of her bags on the floor and stole her money, and told her to "[g]o find the train yourself." (Tr. 433-34, 466) Tatyana began crying and ran into the next room – English's bedroom. As discussed above, English followed her into his bedroom, retrieved a handgun, put

the gun to Tatyana's head, told her to lay down, and raped her.  (Tr. 433-35, 466-67)  The unlawful restraint – the kidnapping – began when English put the gun to Tatyana's head.  After the rape, English continued to restrain Tatyana, ordering her into the bathroom while he showered and dressed.  (Tr. 436-37)

Call records introduced at trial show that English called Shantasia at 10:58 p.m., and that he had a 41-second call with her at that time.  (GX 309 at 11)  At 11:00 p.m., English sent Shantasia two texts, both stating "[c]all me."  (Id.)  Shantasia responded that she could not, because she was with family; English responded "Ok."  (Id. at 12)  It is a fair inference from the evidence that English was not contacting Shantasia at that time about helping to groom the "new girl."  By that time, English had threatened the "new girl" with a gun and violently raped her.  He was then holding Tatyana as a prisoner in his apartment.  A reasonable jury could find that English was contacting Shantasia for advice and help with the current situation, in which he was holding Tatyana at gunpoint.

There is ample evidence that, during the more than four hours that English restrained Tatyana, he was worried that she would flee.  Once Tatyana told English that she wanted to leave, he held a gun to her head and directed her to lay down on his bed.  After the rape, he insisted that she sit in the bathroom with him while he showered.  He took custody over her phone.  And when English and Tatyana left the apartment to purchase water, English told her that he was taking his gun with him, because "he felt like [Tatyana] was going to run."  (Tr. 438)  Given English's evident concern about how to continue his restraint over Tatyana, it is a reasonable inference that his calls and text messages to Shantasia during this period were for purposes of eliciting her help and support with the ongoing restraint of Tatyana.  Indeed, that is the most reasonable explanation for English's calls and text messages to Shantasia.

English next contacted Shantasia at 2:38 a.m., several minutes after Tatyana had broken away from him during their walk to a store to purchase water.  English twice texted Shantasia "[c]ome now."  (GX 309 at 12)  Shantasia did not respond for two hours, by which time English had been arrested.  (Id.)

Once again, it is a fair inference from the evidence that English was not calling Shantasia to ask for her help in grooming the "new girl."  A reasonable jury could instead have found that English was calling Shantasia to ask for her help and assistance in retrieving Tatyana.

As time passed, English realized that he would not be able to retrieve Tatyana, and he deleted his recent texts with Shantasia, in which he had written, "Call me," and "come now."  (GX 309 at 11- 12)  A reasonable jury could have found that English deleted his messages to Shantasia because they were incriminating – both of him and of her.  The deletion of these text messages thus reflects consciousness of guilt.  Indeed, at this same time, English was changing his clothes and hiding his gun.  (Tr. 444, 518)

In sum, a reasonable jury could find that English's 10:58 p.m. call and 11:00 p.m. and 2:38 a.m. text messages to Shantasia were made "in committing or in furtherance of the commission of the [kidnapping] offense."  18 U.S.C. § 1201(a).  While English initially sought Shantasia's assistance in breaking-in the "new girl" for purposes of his prostitution business, after English had threatened Tatyana with a gun, raped her, and held her against her will for more than four hours, a reasonable jury could find that he was not contacting Shantasia about assistance with grooming Tatyana for his prostitution business.  He was instead desperately seeking Shantasia's assistance with his unlawful restraint of Tatyana, and efforts to retrieve her once she fled.

## **<u>CONCLUSION</u>**

For the reasons stated above, Defendant English's motion for a judgment of acquittal is granted as to Count Ten but is otherwise denied.  The Clerk of Court is directed to terminate the motion (Dkt. No. 89).

Dated:  New York, New York
          December 30, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge